1
2
3
4
5
6

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

7

*Attorneys for Plaintiffs*

8

## UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18
19

| | |
|---|---|
| MICHAEL WINSTON and DAVID BUEHLER, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>SAFELITE GROUP, INC.,<br><br>                Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

20
21
22
23
24
25
26
27
28

---

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

THE PARTIES ..................................................................................................................2

JURISDICTION AND VENUE ........................................................................................3

TOLLING AND RELATED ARBITRATION PROCEEDINGS .................................3

SUBSTANTIVE ALLEGATIONS ...................................................................................5

    A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Based Tracking Technologies. ......................................................5

    B.    Defendant Falsely Informed Users That They Could Decline or Reject the Website's Use of Cookies. ..................................................................................10

    C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website. ..............................................................19

        1.    The Website Causes the Interception of the Contents of Communications .......................................................................................19

        2.    Facebook Cookies ................................................................................20

        3.    Google Cookies ...................................................................................25

        4.    Microsoft Bing Cookies ......................................................................30

        5.    TikTok Cookies ...................................................................................32

        6.    Salesforce Cookies ..............................................................................38

        7.    LinkedIn Cookies ................................................................................39

    D.    The Private Communications Collected are Valuable.......................................44

PLAINTIFFS' EXPERIENCES ......................................................................................45

CLASS ALLEGATIONS .................................................................................................51

CAUSES OF ACTION.....................................................................................................53

    First Cause of Action: Invasion of Privacy .........................................................53

    Second Cause of Action: Intrusion Upon Seclusion ...........................................55

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631).........................................................57

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51).................................62

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation .............63

    Sixth Cause of Action: Unjust Enrichment .........................................................66

PRAYER FOR RELIEF ..................................................................................................67

CLASS ACTION COMPLAINT

Plaintiffs Michael Winston and David Buehler ("Plaintiffs") brings this action on behalf of themselves, the general public, and all others similarly situated against Safelite Group, Inc. ("Defendant" or "Safelite"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

**INTRODUCTION**

1.    This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's ecommerce website (www.safelite.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that rather than accepting cookies, they can choose to adjust the Website's "Cookie settings" by clicking or selecting the link to do so, as shown in the following screenshot:



2.    Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3.    Even after users elect to adjust the Website's "Cookie settings" to decline or reject all cookies, other than those "Strictly Necessary Cookies," which Defendant represented were "cookies needed for the [W]ebsite to function," Defendant nonetheless caused multiple third parties—including Meta Platforms, Inc. (Facebook), Google LLC (DoubleClick and Google Analytics), Microsoft Corp. (Microsoft Bing), ByteDance Ltd. (TikTok), Salesforce, Inc.

CLASS ACTION COMPLAINT

(force.com), and LinkedIn Corporation (a subsidiary of Microsoft Corp.) (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

4.      Contrary to users' express rejection of cookies and tracking technologies, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6.      This type of tracking and data sharing is exactly what Website visitors sought to avoid when they adjusted their cookie settings to decline or reject cookies. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7.      Plaintiff Michael Winston is, and was at all relevant times, an individual and resident of Clearlake, California. Plaintiff intends to remain in California and makes his permanent home there

8.      Plaintiff David Buehler is, and was at all relevant times, an individual and resident of El Monte, California. Plaintiff intends to remain in California and makes his permanent home there.

9.      Defendant Safelite Group, Inc. is a Delaware corporation with its headquarters and principal place of business in Columbus, Ohio.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

11.      The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12.      Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

13.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14.      Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## TOLLING AND RELATED ARBITRATION PROCEEDINGS

15.      The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that even though they rejected all non-strictly necessary cookies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data until they learned of Defendant's privacy violations from their counsel. As alleged below, Plaintiffs do not have

CLASS ACTION COMPLAINT

the expertise to test whether the Website honored users' requests to reject all non-strictly necessary cookies.

16.    On or about February 9, 2024, Plaintiff Buehler notified Defendant that he alleged that Defendant knowingly (and without consent) caused third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the Website despite consumers' clear rejection of third-party targeting cookies. Plaintiff Buehler further notified Defendant that he intended to pursue his claims on behalf of himself and other similarly situated class members.

17.    The Website's Terms of Service contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendant before the American Arbitration Association ("AAA").

18.    On July 18, 2024, Plaintiff Buehler filed a demand for arbitration in San Francisco with the AAA against Defendant. *See* Ex. A. Plaintiff Buehler's claims in the arbitration were based on the same misconduct alleged herein.

19.    Arbitrator Carol Kingsley was assigned as the arbitrator.

20.    On December 30, 2024, a preliminary hearing regarding arbitrability of the underlying dispute was held.

21.    After receiving briefing and supporting evidence from the parties, on May 21, 2025, Arbitrator Kingsley issued a final order/award in favor of Plaintiff Buehler, concluding that "This Arbitrator finds that there is no arbitration agreement between the Parties" to arbitrate his claims. *See* Ex. B.

22.    Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's fraudulent and unlawful conduct alleged herein due to its active concealment of material facts, which prevented them from discovering their claims sooner. Further, Plaintiff Buehler's claims were equitably tolled by his demand letter and his filing of the arbitration proceeding because Defendant had notice of the claims (and his intent to pursue them in court as a putative class action). Defendant was not prejudiced in its ability to gather evidence for Plaintiffs' claims since their claims are substantially similar to those asserted in the demand letter and Plaintiff Buehler's

- 4 -

1    arbitration proceeding. These extraordinary circumstances, including Defendant's intentional

2    misrepresentations and Plaintiff Buehler's pursuit of his claims in the arbitration proceeding,

3    warrant tolling of the statute of limitations to allow Plaintiffs to pursue their claims in this forum.

4    Plaintiffs acted in good faith and engaged in reasonable conduct in filing the Complaint in this

5    action.

6                                    **SUBSTANTIVE ALLEGATIONS**

7    **A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize
8           Cookie Based Tracking Technologies.**

9           23.    Every website, including the Website, is hosted by a server that sends and

10   receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to

11   and from Internet users' browsers. For example, when a user clicks on a hyperlink on the

12   Website, the user's browser sends a "GET" request to the Website's server. The GET request

13   tells the Website server what information is being requested (e.g., the URL of the webpage being

14   requested) and instructs the Website's server to send the information back to the user (e.g., the

15   content of the webpage being requested). When the Website server receives an HTTP request, it

16   processes that request and sends back an HTTP response. The HTTP request includes the client's

17   IP address, which allows the Website server to identify the origin of the request and return the

18   response.

19          24.    An IP address (Internet Protocol address) is a unique numerical label assigned to

20   each device connected to a network that uses the Internet Protocol for communication, typically

21   expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4

22   addresses). IP addresses can identify the network a device is on and the specific device within

23   that network. Public IP addresses used for internet-facing devices reveal geographical locations,

24   such as country, city, or region, through IP geolocation databases.

25          25.    As a result, Defendant knew or should have known that the devices used by

26   Plaintiffs and Class members to access the Website were located in California.

27          26.    Defendant voluntarily integrated "third-party resources" from the Third Parties

28   into its Website programming. "Third-party resources" refer to tools, content or services

                                            - 5 -
                            **CLASS ACTION COMPLAINT**

provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

27.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

28.    First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

29.    A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com; www.google.com; bat.bing.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

30.    As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

CLASS ACTION COMPLAINT

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

31.    Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

32.    Defendant is a nationwide provider of automotive glass repair and replacement services in the United States. Defendant offers windshield repair and replacement services to consumers, insurers, and fleet operators, including services scheduled online through its Website. As users interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

33.    Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

CLASS ACTION COMPLAINT

34.     Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy:

**Cookies and Automatic Data Collection Technologies**

Our Website uses cookies (small files placed on your device) or other automatic data collection technologies to distinguish you from other Website users. This helps us deliver a better and more personalized service when you browse our Website. It also allows us to improve our Website by enabling us to:

Estimate our audience size and usage patterns.

Store your preferences so we may customize our Website according to your individual interests.

Speed up your searches.

Recognize you when you return to our Website.

We also may use these technologies to collect information about your online activities over time and across third-party websites or other online services ("behavioral tracking").[1]

…

**Third-Party Use of Cookies and Other Tracking Technologies**

Some content or applications, including advertisements, on the Website are served by third-parties, including advertisers, ad networks and servers, content providers, and application providers. These third parties may use cookies alone or in conjunction with web beacons or other tracking technologies to collect information about you when you use our Website.

The information they collect may be associated with your Personal Information or they may collect information, including Personal Information, about your online activities over time and across different websites, and other online services. They may use this information to provide you with interest-based (behavioral) advertising or other targeted content, and/or improve the quality of your website experience, the performance of our advertisements, facilitate engagement with you and display information to you.

We also share information that we collect from you, such as your email (in hashed form), IP address or information about your browser or operating system, with them. Some of these partners return an online identification code that we may store in our first-party cookie for our use in online and cross-channel advertising and it may be shared with advertising companies to enable interest-based aka targeted aka behavioral advertising…

---

[1]  Safelite Group Privacy Policy (last modified June, 2023) (previously available at https://www.safelite.com/safelite-group-privacy-policy) (the "Privacy Policy"). Based on information and belief, this version was in effect at the time of Plaintiffs' rejections of cookies on the Website.

CLASS ACTION COMPLAINT

**How does this site use Google services?**

We use Google Analytics first-party "cookies:" and the DoubleClick and other partner third-party "cookies" for reporting and advertising. These first- and third-party cookies are used together to help us better understand your interests and online behavior in an aggregate and anonymous form. The Google Analytics rst-party "cookies" are used to compile statistical information and reports on aggregate visitor activity on our Website. We use third-party cookies to enable Google Analytics demographics and interest reporting, which allows us to understand, in aggregate, the age, gender, and interests of our visitors. In addition to this, we use first- and third-party Google Analytics, DoubleClick and other partner "cookies" for remarketing. Remarketing allows our ads to be delivered to visitors on other third-party websites after they leave our Website. This advertising directly relates to offers that may be of interest to you based on your prior Website visit…

35.    Defendant further explained the "Targeting Cookies" used on the Website as follows in its "Privacy Preferences" window:

Targeting Cookies

These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not share directly personal information, but are based on uniquely identifying your browser and internet device.

**B.    Defendant Falsely Informed Users That They Could Decline or Reject the Website's Use of Cookies.**

36.    When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated "We use cookies to enhance your experience." The banner then purported to provide users the opportunity to adjust or manage the Website's "Cookie settings" by clicking or selecting the link to do so rather than accepting all cookies, as shown in the following screenshot from the Website:



37.    Website users, including Plaintiffs, who clicked or selected the "Cookies settings" link were then directed to Defendant's "Privacy Preferences" window. There, Defendant further represented that it "store[d] cookies on [users'] browser[s] to collect information" but that users could "choose not to allow certain types of cookies[,]" including

- 10 -

CLASS ACTION COMPLAINT

1    "Targeting Cookies," which are those set through Defendant's Website by its "advertising

2    partners" and are "used by those companies to build a profile of [user] interests and show [users]

3    relevant adverts on other sites." Defendant disclosed that its Website's users could not decline

4    or reject those cookies "Strictly Necessary…for the website to function[,]" including the sub-

5    categories of "Performance Cookies" and "Functional Cookies," which are "Always Active."

6    These representations were as shown in the following screenshots from the Website's Privacy

7    Preferences window:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



38.     Plaintiffs and other Website users who adjusted the available settings to decline or reject all Targeting Cookies, thereby indicating their choice and/or agreement to decline or reject all such cookies and tracking technologies in use on the Website, could then continue to browse the Website after clicking or selecting the "Confirm My Choices" button, as the popup cookie consent banner and Privacy Preferences window disappeared.

39.     Defendant's popup cookie consent banner and Privacy Preferences window led Plaintiffs, and all those Website users similarly situated, to believe that they declined or rejected all Targeting cookies and tracking technologies, including those used to "build a profile of [user] interests and show [users] relevant adverts on other sites." The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs,

CLASS ACTION COMPLAINT

session information, user identifiers, and/or geolocation data, upon rejecting cookies in the Privacy Preferences window.

40.    Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users rejected targeting cookies in the Privacy Preferences window, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

41.    Nevertheless, even after receiving the notice, Defendant caused the Third Party cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

42.    In particular, when users adjusted the available settings in the Privacy Preferences window to reject targeting cookies, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

43.    Some aspects of the operations of the Third-Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user adjusted all available settings on the Website's Privacy Preferences window to decline or reject Targeting cookies:

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

| Name | Method | Status | Domain | Cookies ▼ |
|---|---|---|---|---|
| chasitor.esw.min.js | GET | 200 | service.force.com | 1 |
| broadcast.esw.min.js | GET | 200 | service.force.com | 1 |
| session.esw.min.js | GET | 200 | service.force.com | 1 |
| eswFrame.min.js | GET | 200 | service.force.com | 1 |
| collect?v=2&tid=G-W987... | POST | 204 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-4JBRL... | POST | 204 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=2... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=2... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=2... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=2... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=2... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=2... | POST | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=2... | POST | 200 | www.google-analytics.com | 1 |
| ec.js | GET | 200 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-W987... | POST | 204 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-4JBRL... | POST | 204 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=4... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=4... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=4... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=4... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-W987... | POST | 204 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-4JBRL... | POST | 204 | www.google-analytics.com | 1 |
| inert.min.js | GET | 200 | service.force.com | 1 |
| invite.esw.min.js | GET | 200 | service.force.com | 1 |
| collect?v=1&_v=j101&a=4... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=4... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=4... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=4... | GET | 200 | www.google-analytics.com | 1 |
| liveagent.esw.min.js | GET | 200 | service.force.com | 1 |
| esw.min.css | GET | 200 | service.force.com | 1 |
| common.min.js | GET | 200 | service.force.com | 1 |
| collect?v=1&_v=j101&a=4... | GET | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=4... | POST | 200 | www.google-analytics.com | 1 |
| collect?v=1&_v=j101&a=4... | POST | 200 | www.google-analytics.com | 1 |
| esw.min.js | GET | 200 | service.force.com | 1 |
| collect?v=2&tid=G-W987... | POST | 204 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-4JBRL... | POST | 204 | www.google-analytics.com | 1 |

CLASS ACTION COMPLAINT

| Name | Method | Status | Domain | Cookies ▾ |
|---|---|---|---|---|
| collect?v=1&_v=j101&a=1... | POST | 200 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-W987... | POST | 204 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-4JBRL... | POST | 204 | www.google-analytics.com | 1 |
| act | POST | 200 | analytics.tiktok.com | 1 |
| blank | GET | 304 | cdn.quantummetric.com | 0 |
| hash-check | OPTIONS | 200 | rl.quantummetric.com | 0 |
| frame.html | GET | 200 | dntcl.qualaroo.com | 0 |
| menu.html?frameIdentifier... | GET | 200 | aebifdkhhhdcdjpifhhbdiojplfjncoa | 0 |
| mpel_storage.html?cmd=... | GET | 200 | safelitees.mpeasylink.com | 0 |
| mpel_storage.html?cmd=... | GET | 200 | safelitees.mpeasylink.com | 0 |
| session.esw.min.js | GET | 200 | service.force.com | 0 |
| eswFrame.min.js | GET | 200 | service.force.com | 0 |
| filetransfer.esw.min.js | GET | 200 | service.force.com | 0 |
| chasitor.esw.min.js | GET | 200 | service.force.com | 0 |
| broadcast.esw.min.js | GET | 200 | service.force.com | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| Availability.jsonp?sid=und... | GET | 200 | d.la1-core2.sfdc-lywfpd.salesfor... | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| Availability.jsonp?sid=und... | GET | 200 | d.la1-core2.sfdc-lywfpd.salesfor... | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| Availability.jsonp?sid=und... | GET | 200 | d.la1-core2.sfdc-lywfpd.salesfor... | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| data | POST | 202 | participants.evolv.ai | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |
| ?T=B&u=https%3A%2F... | POST | 200 | safelite-app.quantummetric.com | 0 |

44.    The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at

CLASS ACTION COMPLAINT

https://wwwsafelite.com. The screenshots depict only network traffic occurring **after** the user declined or rejected all targeting cookies using the available settings in the Privacy Preferences window. As shown above, despite the user's declination or rejection of all such cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.facebook.com, www.google.com, bat.bing.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all cookies and tracking technologies by adjusting the available settings in the Privacy Preferences window. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination or rejection of all such cookies.

45.     Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

46.     As users interact with the Website, even after adjusting all available settings in the Privacy Preferences window, thereby declining or rejecting the use of cookies and similar technologies for targeted advertising, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data.  The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including

psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

47.     The Third Party code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.     The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website.**

**1.     The Website Causes the Interception of the Contents of Communications**

48.     The Website includes a search bar and other input fields which users enter information. For example, below are screenshots of input fields on the Website where users can type into the box their zip code and select options to provide their vehicle information:



**CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    49.    When users input the information into the text boxes and make selections from

17  the dropdown boxes, they intend to communicate directly to the Website.

18    50.    Instead, Defendant programmed the Website so that the contents of those

19  communications are intercepted by the Third Parties while the communications are in transit

20  between the user's browser and the Website.

21    **2.    Facebook Cookies**

22    51.    Defendant also causes third-party cookies to be transmitted to and from Website

23  users' browsers and devices to and from the **facebook.com** domain, even after users elect to

24  decline or reject all targeting cookies. This domain is associated with Meta's digital advertising

25  and analytics platform that collects user information via cookies to assist Meta in performing

26  data collection, behavioral analysis, user retargeting, and analytics.[2] Meta serves targeted ads to

27  web users across Meta's ad network, which spans millions of websites and apps.

28

---

[2] https://www.facebook.com/privacy/policies/cookies/.

CLASS ACTION COMPLAINT

1     52.    Cookies help Meta track whether users complete specific actions after interacting

2  with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that

3  advertisers use to measure ad campaign performance. For example, when a user clicks a button

4  on the Website, Defendant causes the following data to be transmitted to Meta:



| Key | Value |
| --- | --- |
| id | 951042898361822 |
| ev | SubscribedButtonClick |
| dl | https%3A%2F%2Fwww.safelite.com%2F |
| rl | |
| if | false |
| ts | 1707386010483 |
| cd[buttonFeatures] | %7B"classList"%3A"btn%20btn-primary%20round-right%20zip-modified-href%20ga-event-homepage-hero"%2C"destination"%3A"https%3A%2F%2Fwww.safelite.com%2Fschedule-service%3Fstart_type%3Dfmg"%2C"id"%3A"zipCodeTextboxButton"%2C"imageUrl"%3A"%2C"innerText"%3A"Let%27s%20get%20started"%2C"numChildButtons"%3A0%2C"tag"%3A"a"%2C"type"%3Anull%2C"name"%3A""%7D |
| cd[buttonText] | Let%27s%20get%20started |
| cd[formFeatures] | %5B%5D |

CLASS ACTION COMPLAINT

| | |
|---|---|
| sw | 2240 |
| sh | 1260 |
| v | 2.9.145 |
| r | stable |
| ec | 3 |
| o | 4126 |
| fbp | fb.1.1707385900053.119414690 |
| eid | ob3_plugin-set_c2d9f9b8a5075b62cf62c8e6aa913bdb8b21ec0943275129b67e41d94018cb60 |
| ler | empty |
| cdl | API_unavailable |
| it | 1707385899915 |
| coo | false |
| es | automatic |
| tm | 3 |
| exp | e1 |
| rqm | GET |

53.    The "ev" parameter denotes an "event." In this case, the event is a "SubscribedButtonClick," informing Facebook that the user has clicked a button. The button text is disclosed to Facebook in the "cd[buttonText]" parameter.

54.    The "dl" parameter, which stands for "document location," discloses the url that the user was visiting when they clicked the button.

55.    The "sw" and "sh" parameters disclose to Facebook the user's screen height and width, in pixels.

56.    Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent along with the "SubscribedButtonClick" event above:

CLASS ACTION COMPLAINT

57.    The "c_user" cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

58.    In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[3] These cookies allow Meta to collect data on how users interact with websites, regardless of whether the user has a Facebook account or is logged in.[4]

---

[3] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect
[4] https://allaboutcookies.org/what-data-does-facebook-collect.

59.     The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[5]

60.     Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

61.     Further, along with all of this data, the Facebook software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Facebook:

| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.0.0 Safari/537.36 |
|---|---|

62.     The "user-agent" corresponds to the device and browser that the user has used to access the Website.

---

[5] *Id.*

63.    Finally, the data sent to Meta includes the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

**3.    Google Cookies**

64.    Defendant causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users decline or reject all targeting cookies, to and from the **www.google.com**, **analytics.google.com**, **www.google-analytics.com**, and **doubleclick.net** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[6] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[7] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[8]

65.    Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[9] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might

---

[6] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).
[7] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.
[8] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).
[9] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

**CLASS ACTION COMPLAINT**

load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

66.    Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[10] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[11]

67.    Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[12]

68.    For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at googleads.g.doubleclick.net:

---

[10] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).
[11] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).
[12] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



| Key | Value |
| --- | --- |
| async | 1 |
| auid | 821088454.1707385898 |
| bg | ffffff |
| cv | 11 |
| data | event=gtag.config |
| dma | 0 |
| fledge | 1 |
| fmt | 4 |
| frm | 0 |
| fst | 1707386015300 |
| gcd | 13l3l3l3l1 |
| gtm | 45je4250v9126448610z86592286za200 |
| guid | ON |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| random | 1707386015300 |
| ref | https://www.safelite.com/ |
| rfmt | 3 |
| tiba | Vehicle – Safelite AutoGlass® |
| u_h | 1260 |
| u_w | 2240 |
| uaa | arm |
| uab | 64 |

CLASS ACTION COMPLAINT

| | |
|---|---|
| uafvl | Not%20A(Brand;99.0.0.0\| Google%20Chrome;121.0.6167.160\| Chromium;121.0.6167.160 |
| uamb | 0 |
| uap | macOS |
| uapv | 13.5.0 |
| uaw | 0 |
| url | https://fixmyglass.safelite.com/FixMyGlass/VehicleDamage.aspx |

69.    The "npa" parameter refers to "Non-Personalized Ads." When npa is set to 1, it indicates the non-personalized ads preference is enabled. Here, npa is set to 0, indicating that standard (personalized) ads are enabled.

70.    The "url" and "tiba" parameters disclose to Google the exact webpage and title that the user was viewing.

71.    The "u_h" and "u_w" parameters correspond to the user's screen height and width.

72.    The parameters beginning in "ua…" tell Google extensive information about the user's device and browser, including the specific operating system, browser brand, and device processor.

73.    Along with this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the following cookies to be sent to Google's domain:



74.     Google documentation confirms that the "IDE" cookie is used for advertising. Specifically, it is "used to show Google ads on non-Google sites."[13]

75.     Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google:

user-agent          Mozilla/5.0 (Macintosh; Intel Mac OS X
                    10_15_7) AppleWebKit/537.36 (KHTML, like
                    Gecko) Chrome/121.0.0.0 Safari/537.36

76.     The "user-agent" corresponds to the device and browser that the user has used to access the Website.

77.     Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

78.     Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

79.     Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains

---

[13] https://policies.google.com/technologies/cookies?hl=en-US.

CLASS ACTION COMPLAINT

allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[14]

80.    Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[15] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

### 4.    Microsoft Bing Cookies

81.    Defendant also causes third party cookies to be transmitted to and from the Website users' browsers and devices, even after users elect to reject all cookies, to and from the **bat.bing.com** domain. "The webpage bat.bing.com is a host for Bing Ads Conversion tracking code. This webpage is owned by Microsoft[.]"[16] The domain is associated with Bing, Microsoft's search engine, as well as Microsoft's digital advertising and analytics platforms. When a webpage loads a bat.bing.com cookie, it "tells Microsoft Advertising about the user visits to [the] webpage."[17] Microsoft uses bat.bing.com cookies to "record[] what customers do

---

[14] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

[15] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[16] https://answers.microsoft.com/en-us/msadvs/forum/all/does-batbing-track-your-browser-searches-and-sites/0a402f00-60c2-4d54-bd7d-81b67ccc7f13.

[17]https://help.ads.microsoft.com/apex/index/3/en/56959#:~:text=The%20most%20important%20request%20is,making%20when%20your%20webpage%20loads.

on [a] website and send[] that information to Microsoft Advertising."[18] Microsoft then serves targeted ads to web users across its extensive ad networks, which utilizes its "rich" supply of gathered data to "reach more than a billion people[.]"[19]

82.     For example, the Website causes the following type of cookie data to be sent to Microsoft, even after users have rejected such cookies:



(cropped for readability)

83.     According to Microsoft's documentation, the "MUID" cookie "[i]dentifies unique web browsers visiting Microsoft sites [and is] used for advertising, site analytics, and other operational purposes."[20] The "MSPTC" cookie is "[u]sed by Microsoft Advertising to help deliver more relevant ads, limit how often ads are shown, and measure the effectiveness of advertising campaigns."[21]

84.     Bat.bing.com cookies collect consumers' (i) search history and browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information (including zip code[22]; gender[23]; age[24] (including identifying whether that person is a minor or not)); (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data

---

[18] https://help.ads.microsoft.com/#apex/ads/en/56960/1.
[19] https://answers.microsoft.com/en-us/msadvs/forum/all/opt-out-of-audience-ads/753bc0fc-c04f-4e20-a94a-abaa950ccf31#:~:text=When%20you%20come%20to%20Microsoft,and%20rich%20first%2Dparty%20data.
[20] https://learn.microsoft.com/en-us/clarity/setup-and-installation/cookie-list.
[21] https://www.cookie.is/MSPTC#.
[22] https://help.ads.microsoft.com/#apex/ads/en/60212/0.
[23] *Id.*
[24] *Id.*

CLASS ACTION COMPLAINT

(including IP addresses). Bat.bing.com updates this information each time a user clicks on a website hosting a third-party bat.bing.com cookie.

85.    Bat.bing.com cookies help Microsoft track users' interactions with ads (e.g., clicking a link or making a purchase) and provide valuable metrics that advertisers use to measure ad campaign performance. Further, bat.bing.com cookies allow Microsoft to obtain and store at user data to "help [website owners] focus a campaign or ad group on potential audiences who meet [website owners'] specific criteria, so [website owners] can increase the chance that [consumers] see [website owners'] ads." [25] Further, bat.bing.com offers [website owners] valuable "conversion tracking," which is a "measure [of] the ROI (return on investment) of your advertising campaign by letting [website owners] assign a monetary value to the activities people complete on [website owners] website after clicking [website owners'] ad."[26]

86.    Microsoft also utilizes bat.bing.com data for its own purposes, including by using the data to tailor content and target advertisements to users. This profile enables Microsoft to deliver highly targeted ads within Microsoft's extensive advertising network Microsoft's revenue from its advertising network program has exceeded $10 billion as of 2022.[27]

### 5.    TikTok Cookies

87.    Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users have rejected all targeting cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing. The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[28]

---

[25] https://help.ads.microsoft.com/#apex/ads/en/60212/0.
[26] https://help.ads.microsoft.com/#apex/ads/en/56680/2.
[27] https://digiday.com/media/microsofts-ad-revenue-hit-10b-and-its-investing-is-a-sleeping-giant-about-to-wake/.
[28] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

**CLASS ACTION COMPLAINT**

88.     TikTok utilizes cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[29] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data across sessions and domains to observe and evaluate TikTok user behavior.

89.     These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[30]

90.     For example, the TikTok software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to TikTok's domain, at analytics.tiktok.com:

---

[29] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[30] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

```
POST    200    https://analytics.tiktok.com/api.

Request  Header  Query  Body  Cookies  Raw | Summary PLAIN ⌄  ⬮

1  ⌄  {
2       "_inspection": {},
3       "action": "Click",
4  ⌄    "auto_collected_properties": {
5         "page_trigger": "Click",
6  ⌄      "trigger_element": {
7  ⌄        "attributes": {
8             "class": "save-preference-btn-handler
              onetrust-close-btn-handler"
9           },
10          "inner_text": "Confirm My Choices",
11          "num_child_buttons": 0,
12  ⌄       "position": {
13            "x": 15,
14            "y": 864
15          },
16          "tag": "BUTTON",
17          "timestamp": "2024-02-08T09:52:29.645Z",
18          "xpath": "/HTML/body[1]/div[12]/div[2]/div
              [3]/div[1]/button[1]"
19        }
20      },
21  ⌄    "context": {
22  ⌄      "ad": {
23          "jsb_status": 2,
24          "sdk_env": "external"
25        },
```

CLASS ACTION COMPLAINT

```
26 ⌄    "device": {
27        "platform": "pc"
28      },
29      "index": 0,
30 ⌄    "library": {
31        "name": "pixel.js",
32        "version": "2.1.33"
33      },
34 ⌄    "page": {
35        "referrer": "",
36        "url": "https://www.safelite.com/"
37      },
38      "pageview_id":
        "pageId-1707385900144-3371093310909",
39 ⌄    "pixel": {
40        "code": "CE4L213C77UDF970KI20",
41        "codes": "CE4L213C77UDF970KI20",
42        "runtime": "1"
43      },
44      "session_id":
        "a81460b8-c667-11ee-9f26-08c0eb4a4aea::k2FO8C
        VppTfqPNKfX2Fu",
45 ⌄    "user": {
46        "anonymous_id":
          "7XoOWfPPrkHpHtkdmIN7l0sJDtf"
47      },
```

CLASS ACTION COMPLAINT

```
48        "userAgent": "Mozilla/5.0 (Macintosh; Intel
          Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML,
          like Gecko) Chrome/121.0.0.0 Safari/537.36",
49        "variation_id": "default"
50      },
51      "event_id": "",
52      "is_onsite": false,
53      "message_id":
        "messageId-1707385949645-5947878928014",
54      "properties": {},
55    ∨ "signal_diagnostic_labels": {
56    ∨   "hashed_email": {
57          "label": "missing"
58        },
59    ∨   "hashed_phone": {
60          "label": "missing"
61        },
62    ∨   "raw_auto_email": {
63          "label": "missing"
64        },
65    ∨   "raw_auto_phone": {
66          "label": "missing"
67        },
68    ∨   "raw_email": {
69          "label": "missing"
70        },
71    ∨   "raw_phone": {
72          "label": "missing"

73        }
74      },
75      "timestamp": "2024-02-08T09:52:29.645Z"
76    }
```

91.     The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user or device to enhance advertising measurement, attribution, and targeting.[31]

92.     The data further indicates, among other things, that the user has viewed the page on the Defendant's website at the url https://www.safelite.com, that the user clicked a button labeled "Confirm My Choices," and the exact time the button click happened—down to the

---

[31] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

CLASS ACTION COMPLAINT

millisecond. Further, the data contains the user-agent information, disclosing the user's device, operating system, and browser.

93.     Along with this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the "_ttp" cookie to be sent to TikTok's domain:



94.     According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[32]

95.     Further, along with all of this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok in the header (as well as in the body of the network request, as discussed above):

> user-agent          Mozilla/5.0 (Macintosh; Intel Mac OS X
>                     10_15_7) AppleWebKit/537.36 (KHTML, like
>                     Gecko) Chrome/121.0.0.0 Safari/537.36

96.     As discussed above with respect to Facebook, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

97.     Finally, the data sent to TikTok includes the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

98.     By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of

---

[32] *See* TikTok for Business: Using Cookies with TikTok Pixel
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyzing user responses to ads and content).[33]

99.    Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. Tiktok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[34]

### 6.    Salesforce Cookies

100.    Defendant also causes third-party cookies to be transmitted to and from users' browsers and devices on the Website, even after users elect to decline or reject all targeting cookies, to and from at least one domain associated with Salesforce, Inc., including **service.force.com**.

101.    Salesforce is a multi-billion-dollar software company that provides software applications focused on sales, customer service, marketing automation, e-commerce, and analytics.[35] Salesforce owns and operates Salesforce Platform, which is associated with the force.com domain.[36] Salesforce Platform hosts the company's many software suites and applications.[37] These include a large e-commerce Marketing Cloud, which collects user data and shares it with third parties for targeted advertising, analytics, and personalized content.[38] Commerce Cloud, another application suite, features "powerful AI that proactively helps merchants with storefront setup and channel optimization[.]"[39] While the Commerce Cloud

---

[33] *See* TikTok for Business: Using Cookies with TikTok Pixel
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[34] TikTok for Business: How to set up Automatic Advanced Matching (available at
https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).
[35] https://en.wikipedia.org/wiki/Salesforce.
[36] *Id.*
[37] *Id.*
[38] https://cop.evidon.com/companies/igodigital.
[39] https://www.salesforce.com/commerce/?cc=dwdcmain.

includes tools for e-commerce that allow users to purchase products from websites, it also includes an analytic component that observes user interactions with a website in real time to make "personalized offers" to users based on their behavior.[40]

102.    Such software applications are enabled by way of cookies and other tracking technologies, including those that appear on Defendant's Website, which users were led to believe they had declined or rejected. These cookies allow Salesforce to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

103.    In addition, Salesforce receives the user's user-agent information and IP address.

**7.    LinkedIn Cookies**

104.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject all non-essential cookies, to and from the **px.ads.linkedin.com** domain.

105.    The linkedin.com domain is owned by LinkedIn Corporation—a subsidiary of Microsoft Corp. LinkedIn Corporation runs the social media-based business networking platform LinkedIn. Cookies set by the linkedin.com domain are used to target website users with advertising and measure the performance of such ads.[41] These cookies assign a unique ID to users' devices, which allows LinkedIn to track users across the internet, and to collect information regarding IP address, operating system, browser information, web browsing activity—including the URL of both the site the users came from before accessing the website with the linkedin.com cookies and the one to which users navigate when they leave the website with the linkedIn.com cookies—download and purchase activity, and how users interact with

---

[40] https://www.salesforce.com/commerce/innovations/.
[41] https://cookiepedia.co.uk/host/linkedin.com.

CLASS ACTION COMPLAINT

1   ads.[42]  Cookies set by the linkedIn.com domain are used to target users with advertisements on

2   and off the LinkedIn social media platform.[43]

3        106.    For example, the following data was sent to LinkedIn after cookies were rejected:

```
28 ⌄   {
29 ⌄     "classes": [
30         "hero-full-width-with-zip",
31         "hero-wrapper"
32       ],
33       "nthChild": 0,
34       "tagName": "div"
35     },
36 ⌄   {
37 ⌄     "classes": [
38         "hero-container"
39       ],
40       "nthChild": 0,
41       "tagName": "div"
42     },
43 ⌄   {
44 ⌄     "classes": [
45         "hero-content"
46       ],
47       "nthChild": 0,
48       "tagName": "div"
49     },
50 ⌄   {
51 ⌄     "classes": [
52         "input-group-comp"
53       ],
```

CLASS ACTION COMPLAINT

```
54          "nthChild": 2,
55          "tagName": "div"
56        },
57    ˅   {
58          "nthChild": 1,
59          "tagName": "div"
60        },
61    ˅   {
62    ˅     "attributes": {
63            "href": "/schedule-service?start_type=fmg",
64            "onclick": "addZipToHREF(this)"
65          },
66    ˅     "classes": [
67            "btn",
68            "btn-primary",
69            "ga-event-homepage-hero",
70            "round-right",
71            "zip-modified-href"
72          ],
73          "id": "zipCodeTextboxButton",
74          "nthChild": 0,
75          "tagName": "a"
76        }
77      ],
78      "href": "/schedule-service?start_type=fmg",
79      "innerElements": null,
80      "isFilteredByClient": false,

81      "isLinkedInApp": false,
82      "isTranslated": false,
83      "liFatId": "",
84      "liGiant": "",
85    ˅ "misc": {
86        "psbState": 31
87      },
88      "pageTitle": "Windshield Repair & Replacement |
        Safelite",
89    ˅ "pids": [
90        27846
91      ],
92      "scriptVersion": 119,
93      "signalType": "CLICK",
94      "time": 1707386010393,
95      "url": "https://safelite.com/",
96      "websiteSignalRequestId":
        "75343ad1-9831-1f58-5601-7fb76fffdd01"
97    }
```

CLASS ACTION COMPLAINT

107.    This data includes extensive information about the user's visit, including the exact page title and url visited, and the button that the user clicked.

108.    Along with this data, cookies are sent to LinkedIn:



109.    "Bookie" is a "[b]rowser Identifier cookie to uniquely identify devices accessing LinkedIn."[44]

110.    The "AnalyticsSyncHistory" cookie indicates that LinkedIn synced the user's profile to identify LinkedIn members who are not currently using LinkedIn.[45]

111.    The "UserMatchHistory" cookie is used for "LinkedIn ads ID syncing."[46]

112.    The "li_sugar" cookie is used by LinkedIn to make probabilistic matches of a user's identity.[47]

113.    These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data— including whether a user is located in California.

114.    In addition, LinkedIn receives the user's user-agent information and IP address.

---

[44] https://www.linkedin.com/legal/l/cookie-table
[45] *Id.*
[46] *Id.*
[47] *Id.*

CLASS ACTION COMPLAINT

**D.     The Private Communications Collected are Valuable.**

115.     As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

116.     The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to automotive glass repair or replacement services and then target those users with advertisements for similar products and services both on the Website and across unrelated third-party websites.

117.     Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products and services. At scale, this data enables Defendant to assess trends across its brands and within the broader automotive glass services market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

118.     The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[48] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

---

[48] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

119.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

120.    By falsely representing consumers' ability to decline targeting cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Winston**

121.    Plaintiff Winston visited the Website to seek and obtain information about Safelite's services, while located in California, on one or more occasions during the last four years.

122.    Plaintiff Winston's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Winston is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

123.    When Plaintiff Winston visited the Website, immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Cookie settings" link. Plaintiff Winston viewed Defendant's representation on the popup cookie consent banner that, "We use cookies to enhance your experience."

124.    Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Winston selected and clicked the "Cookie settings" link, which caused Defendant's Privacy Preferences window to appear. There, Plaintiff Winston viewed Defendant's representation that, "[Defendant] store[s] cookies on your browser to collect information." Plaintiff Winston viewed Defendant's further

- 45 -

representation that he could "choose not to allow certain types of cookies." Plaintiff Winston viewed the options or settings available on the Privacy Preferences window and saw that he could decline or reject all targeting cookies.

125.    Plaintiff Winston believed that adjusting the available settings on the Privacy Preferences window found on the Website would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks for the purposes of providing targeted advertising). Accordingly, Plaintiff Winston adjusted the setting or toggle button on the Targeting Cookies tab, clicked or selected the "Confirm My Choices" button, and proceeded to browse the Website.

126.    In adjusting all available settings on the Privacy Preferences window, Plaintiff Winston gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Winston specifically declined or rejected, based on Defendant's representations, those cookies used to "build a profile of [user] interests and show [users] relevant adverts on other sites" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Winston continue browsing the Website.

127.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for targeted advertising, to be placed on Plaintiff Winston's device and/or transmitted to the Third Parties along with user data, without Plaintiff Winston's knowledge. Accordingly, Defendant's representation to Plaintiff Winston that in the Privacy Preference window that he could "choose not to allow" the use and/or placement of cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Winston believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

CLASS ACTION COMPLAINT

128. Then, as Plaintiff Winston continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Privacy Preferences window, and despite Plaintiff Winston's clear declination or rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Winston's Private Communications as Plaintiff Winston browsed the Website.

129. Defendant's representations that consumers could adjust their cookie settings and "choose not to allow certain types of cookies" while Plaintiff Winston and users browsed the Website, or at least those involved in providing targeted advertising, were untrue. Had Plaintiff Winston known this fact, he would not have used the Website. Moreover, Plaintiff Winston reviewed the popup cookie consent banner and Privacy Preferences window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline or reject all such cookies, Plaintiff Winston would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

130. Plaintiff Winston continues to desire to browse content featured on the Website. Plaintiff Winston would like to browse websites that do not misrepresent that users can decline or reject all non-strictly necessary cookies and tracking technologies. If the Website were programmed to honor users' requests to decline or reject all non-strictly necessary cookies and tracking technologies, Plaintiff Winston would likely browse the Website again in the future, but will not do so until then. Plaintiff Winston regularly visits websites that feature content similar to that of the Website. Because Plaintiff Winston does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to decline or reject all non-strictly necessary cookies and tracking technologies, Plaintiff Winston will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that

prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Winston is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff David Buehler**

131.    Plaintiff Buehler visited the Website to seek information about Safelite's services, while located in California, on one or more occasions during the last four years, including in 2023.

132.    Plaintiff Buehler's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Buehler is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices. Plaintiff Buehler visited the Website to obtain pricing information for repairing a chip in his automobile's windshield at one of Defendant's service locations.

133.    When Plaintiff Buehler visited the Website, immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Cookie settings" link. Plaintiff Buehler viewed Defendant's representation on the popup cookie consent banner that, "We use cookies to enhance your experience."

134.    Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Buehler selected and clicked the "Cookie settings" link, which caused Defendant's Privacy Preferences window to appear. There, Plaintiff Buehler viewed Defendant's representation that, "[Defendant] store[s] cookies on your browser to collect information." Plaintiff Buehler viewed Defendant's further representation that he could "choose not to allow certain types of cookies." Plaintiff Buehler viewed the options or

CLASS ACTION COMPLAINT

settings available on the Privacy Preferences window and saw that he could decline or reject all targeting cookies.

135.    Plaintiff Buehler believed that adjusting the available settings on the Privacy Preferences window found on the Website would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks for the purposes of providing targeted advertising). Accordingly, Plaintiff Buehler adjusted the setting or toggle button on the Targeting Cookies tab, clicked or selected the "Confirm My Choices" button, and proceeded to browse the Website.

136.    In adjusting all available settings on the Privacy Preferences window, Plaintiff Buehler gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Buehler specifically declined or rejected, based on Defendant's representations, those cookies used to "build a profile of [user] interests and show [users] relevant adverts on other sites" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Buehler continue browsing the Website.

137.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for targeted advertising, to be placed on Plaintiff Buehler's device and/or transmitted to the Third Parties along with user data, without Plaintiff Buehler's knowledge. Accordingly, Defendant's representation to Plaintiff Buehler that in the Privacy Preference window that he could "choose not to allow" the use and/or placement of cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Buehler believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

138.    Then, as Plaintiff Buehler continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Privacy Preferences window, and

despite Plaintiff Buehler's clear declination or rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Winston's Private Communications as Plaintiff Buehler browsed the Website.

139.    Defendant's representations that consumers could adjust their cookie settings and "choose not to allow certain types of cookies" while Plaintiff Buehler and users browsed the Website, or at least those involved in providing targeted advertising, were untrue. Had Plaintiff Buehler known this fact, he would not have used the Website. Moreover, Plaintiff Buehler reviewed the popup cookie consent banner and Privacy Preferences window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline or reject all such cookies, Plaintiff Buehler would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

140.    Plaintiff Buehler continues to desire to browse content featured on the Website. Plaintiff Buehler would like to browse websites that do not misrepresent that users can decline or reject all non-strictly necessary cookies and tracking technologies. If the Website were programmed to honor users' requests to decline or reject all non-strictly necessary cookies and tracking technologies, Plaintiff Buehler would likely browse the Website again in the future, but will not do so until then. Plaintiff Buehler regularly visits websites that feature content similar to that of the Website. Because Plaintiff Buehler does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to decline or reject all non-strictly necessary cookies and tracking technologies, Plaintiff Buehler will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as

Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Buehler is not a software developer and has not received training with respect to HTTP network calls.

## **CLASS ALLEGATIONS**

141.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed the Website in the State of California after rejecting all non-strictly necessary cookies in the Website's Privacy Preferences window.

142.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

143.    **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

144.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to decline or reject all non-strictly necessary cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

145.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.    Whether Defendant's actions violate California laws invoked herein; and

b.    Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

146.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, declined or rejected non-strictly necessary cookies, and had his confidential Private Communications intercepted by the Third Parties.

147.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent his interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

148.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

149.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

150.    To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

151.    Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

152.    Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "choose not to allow certain types of" cookies and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner and Privacy Preferences window on the Website, Plaintiffs and Class members declined or rejected all targeting cookies and reasonably expected that his and their declination or rejection of all such cookies and tracking technologies would be honored. That is, he and they reasonably believed that Defendant would not permit the

Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they declined or rejected all such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

153. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

154. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

CLASS ACTION COMPLAINT

155.    Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

156.    Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

157.    Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

158.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

159.    Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

160.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination or rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

161.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

162.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had

1    a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a

2    reasonable person.

3        163.    By permitting third-party cookies to be stored on consumers' devices without

4    consent, which caused the Third Parties to track and collect Plaintiffs' and Class members'

5    Private Communications, including their browsing history, visit history, website interactions,

6    user input data, demographic information, interests and preferences, shopping behaviors, device

7    information, referring URLs, session information, user identifiers, and/or geolocation data, in

8    violation of Defendant's representations otherwise in the popup cookie consent banner,

9    Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant

10   effectively placed the Third Parties in the middle of communications to which they were not

11   invited, welcomed, or authorized.

12       164.    The Third Parties' tracking and collecting of Plaintiffs' and Class member's

13   Private Communications on the Website using third-party cookies that Defendant caused to be

14   stored on users' devices—and to be transmitted to Third Parties—was not authorized by

15   Plaintiffs and Class members, and, in fact, those Website users specifically chose to decline or

16   reject all targeting cookies.

17       165.    Plaintiffs and the Class members had an objectively reasonable expectation of

18   privacy surrounding his and their Private Communications on the Website based on Defendant's

19   promise that users could decline or reject all such cookies, as well as state criminal and civil laws

20   designed to protect individual privacy.

21       166.    Defendant's intentional intrusion into Plaintiffs' and other users' Private

22   Communications would be highly offensive to a reasonable person given that Defendant

23   represented that Website users could decline or reject all targeting cookies, when, in fact,

24   Defendant caused such third-party cookies to be stored on consumers' devices and browsers,

25   and to be transmitted to third parties, even when consumers declined or rejected all such cookies.

26   Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false

27   representations, that when he and they declined or rejected all such cookies and tracking

28   technologies, Defendant would not cause such third-party cookies to be stored on his and their

devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

167.     Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

168.     Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

169.     Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

170.     Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination or rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Third Cause of Action</u>: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

171.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

172.     California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

- 57 -

173.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

174.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

175.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

176.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

177.    Defendant is a "person" within the meaning of California Penal Code § 631.

- 58 -

178.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

179.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

180.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

181.    Under § 631(a), Defendant must show it had the consent of all parties to a communication.

182.    At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to

the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

183.    At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

184.    The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

185.    At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

186.    Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications

by choosing to decline or reject all targeting cookies, using the settings available in the Privacy Preferences window.

187.    The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

188.    Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of his and their right to privacy, (ii) loss of value in his and their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

189.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

190.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant.  Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to automotive glass repair and replacement services. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if his and their

request to decline or reject non-strictly necessary cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action**: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)

191.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

192.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

193.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

194.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

195.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

196. At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

197. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

198. Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by adjusting available settings in the Privacy Preferences window to decline or reject all targeting cookies.

199. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

200. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

201. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

202. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

203. Defendant fraudulently and deceptively informed Plaintiffs and Class members that he and they could decline or reject all targeting cookies.

204.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users adjusted all available settings in the Privacy Preferences window to decline or reject all targeting cookies. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to decline or reject all such cookies.

205.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to decline or reject all targeting cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

206.    Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

207.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of his and their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session

information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of his and their private and personally identifiable information and communications.

208.    Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

209.    Defendant's representation that consumers could decline or reject  cookies (including those cookies "set through [the Website] by [Defendant's] advertising partners" and "used by those companies to build a profile of [user] interests and show [users] relevant adverts on other sites"), if they adjusted the available settings to decline or reject all such cookies, was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and Privacy Preferences window prior to their interactions with the Website. Had Defendant disclosed that it caused third-party non-strictly necessary cookies to be stored on Website visitors' devices that are related to targeted advertising, and/or share information with third parties even after they choose to decline or reject all targeting cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

210.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to decline or reject all non-strictly necessary cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

211.    Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

212.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

213.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' decline or reject all targeting cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Sixth Cause of Action: Unjust Enrichment**

214.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

215.    Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

216.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could decline or reject all targeting cookies, and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members declined or rejected all such cookies.

217.    Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

218.    Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

219.    Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at his and their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

220.    It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

221.    There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

222.    Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position he and they occupied prior to having his and their Private Communications tracked and collected by the Third Parties.

223.    Plaintiffs plead this claim separately, as well as in the alternative, to his other claims, as without such claims Plaintiffs would have no adequate legal remedy.

**PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully request judgment against Defendant as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.    An award of punitive damages;

D.    An award of nominal damages;

E.    An order for full restitution;

F.    An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.    For reasonable attorneys' fees and the costs of suit incurred; and

I.    For such further relief as may be just and proper.

Dated: January 22, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

# EXHIBIT A

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Claimant*

## AMERICAN ARBITRATION ASSOCIATION

## SAN FRANCISCO REGIONAL OFFICE

| | |
|---|---|
| DAVID BUEHLER,<br><br>                     Claimant,<br><br>     v.<br><br>SAFELITE GROUP, INC.,<br><br>                     Respondent. | Arbitration Case No.<br><br>**COMPLAINT AND DEMAND FOR ARBITRATION** |

Claimant David Buehler ("Claimant") brings this action against Safelite Group, Inc. ("Respondent" or "Safelite").[1] Claimant's allegations are based upon information and belief and upon investigation of Claimant's counsel, except for allegations specifically pertaining to Claimant, which are based upon Claimant's personal knowledge.

## **INTRODUCTION**

1.      This Complaint and Arbitration Demand concerns an egregious privacy violation and breach of consumer trust in blatant violation of California law. Respondent's website, www.safelite.com (the "Website"), is configured to use a multitude of cookies to enable third

---

[1] **Claimant files this Complaint and Arbitration Demand without waiver of any right or argument, including without limitation, that Claimant did not assent to Respondent's arbitration agreement and/or that the purported arbitration agreement is unlawful and/or unenforceable.**

parties to track users' activity and communications on the Website even after users decline or reject such cookies. Respondent presented all visitors to the Website with a pop-up cookies window that purported to give Website users the opportunity to adjust their "Cookie settings." In selecting the hyperlink to adjust cookie settings, users were directed to a window titled "Privacy Preferences[,]" where Respondent represented that Website users could "choose not to allow certain types of cookies[.]" Users could apparently adjust settings in the Privacy Preferences window to decline or reject the Website's use of "Targeting Cookies." By adjusting the settings to decline or reject Targeting Cookies, as described above, Claimant believed that he had declined or rejected all categories of cookies, including targeting cookies, other than those "Strictly Necessary" for the operation of the Website. Claimant, and hundreds of thousands of Website visitors, did just that—they chose to decline or reject all targeting cookies by clicking the hyperlink on the pop-up cookies window to adjust cookie settings, changing the setting to decline or reject all Targeting Cookies, and confirming their choices. Then, Claimant proceeded to browse the Website. But, unbeknownst to Claimant, and contrary to his express declination or rejection of *all categories of cookies, including Targeting Cookies,* other than those cookies strictly necessary for the operation of the Website, Respondent nonetheless caused cookies that were not strictly necessary for Website's operability—both from Respondent and third parties with notorious privacy records—including Facebook, Microsoft/Bing, Google/DoubleClick, LinkedIn, Salesforce, TikTok, and others—to be placed on Claimant's device(s). In doing so, Respondent caused the transmission of extensive data about Claimant to undisclosed third parties for advertising and other purposes not strictly necessary for the operation of the Website, contrary to Respondent's representations and Claimant's express directions.

2.    Many of the third-party cookies that Respondent wrongfully placed on Claimant's and other consumers' devices and browsers were among the "Targeting Cookies" that Claimant and other users thought they had declined or rejected. These cookies are designed to track consumers' behavior across websites for targeted advertising and other purposes. These cookies are invasive because they allow third parties to track and collect, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage

keywords; buttons the consumers click; the exact date and time of the website visits; consumers' IP addresses; product page visits; and/or data entered by Claimant into forms on the Website.

3.      Respondent allowed these third parties access to Claimant's and other Website users' communications with Respondent and enabled them to collect data on consumers for use for those parties' own purposes, including building profiles of consumers' interests and targeting advertising to them. This type of monitoring and data sharing is exactly what the consumers, such as Claimant, who declined or rejected such cookies sought to avoid. Despite receiving notice of consumers' declination of consent, through their express declination or rejection of all Targeting Cookies, Respondent defied it. In doing so, Respondent violated privacy statutes, state consumer protection statutes, tort duties, and breached its contract and the implied covenant of good faith and fair dealing with Claimant.[2]

## PARTIES

4.      Claimant David Buehler is, and was at all relevant times, an individual and resident of California. Claimant intends to remain in California and makes his permanent home there.

5.      Respondent Safelite Group, Inc. is a Delaware corporation with its headquarters and principal place of business in Columbus, Ohio. Respondent does business in California through the Website, which promotes its services to residents of California.

## SUBSTANTIVE ALLEGATIONS

6.      Respondent provides nationwide automotive glass repair and replacement services, including windshield chip repair, windshield replacement, window replacement, and other related services. Respondent also owns and operates the Website, which allows visitors to, among other things, view information about Respondent's services, obtain service quotes, and schedule services.

---

[2] Claimant has not included class allegations in this Complaint and Demand but reserves the right to do so in an amended complaint once the Arbitrator has decided all threshold issues related to this Arbitration including without limitation jurisdiction, scope, and applicability.

7.    Respondent chose to integrate the Website with cookies from third parties, which, among other things, track users' behavior on the Website.

8.    Cookies are small text files that website servers can cause to be placed on an internet user's device when that user's browser interacts with the website through its servers. First-party cookies are cookies that are placed on a user's browser directly by the webserver with which the user is knowingly communicating (in this case, the Website). Third-party cookies are cookies that are set by other webservers (e.g. facebook.com, google.com, etc.). When a consumer visits the Website, both first-party cookies and third-party cookies are placed on the consumer's browser. All of this is caused by software code that Respondent incorporates into its Website, or that Respondent causes to be loaded. Because Respondent controls the software code of its Website, it has complete control over whether first-party and third-party cookies are set on users' devices when they visit the Website.

9.    Third-party cookies, including those on the Website, are typically designed to track and record an internet user's communications with and activities on websites. Third-party cookies typically work in furtherance of data collection, analytics, behavior profiling, and targeted advertising.

10.    Cookies are the backbone of digital advertising. Because cookies enable third parties to track users' behavior across the internet and correlate data collected to specific users, advertisers and purveyors of websites can gain deep understanding of users' behavioral traits and target those users with advertisements tailored to their interests.

11.    As a research director at the Electronic Frontier Foundation put it, third-party cookies allow these companies "to be a silent third-party watching whatever you're doing."[3]

---

[3] Jefferson Graham, Facebook spies on us but not by recording our calls. Here's how the social network knows everything, USA Today (March 4, 2020 4:52 am), https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/.

12.     Every website is hosted by a web server through which it sends and receives communications with internet users and their web browsers to display web pages on users' devices.

13.     Users communicate with websites by sending HTTP requests, such as "GET" or "POST" requests. For example, when a user clicks on a hyperlink within a website, the user sends an HTTP request to the server hosting the website to which the user is sending the communication. The HTTP request tells the web server what information is being requested and instructs the web server to send that information to the user.

14.     When a website has third-party cookies, those cookies are simultaneously placed on the user's device and made accessible to the user's browser. This allows third-party cookie companies to intercept contents of the internet user's communications with websites, including data such as the URLs being browsed by the user; the webpage title; button clicks; and the date and time of the website visit.

15.     URLs, for instance, both identify an internet resource and describe its location or address. They often contain the name of the website, folder, and sub-folders on the server and the name of the file requested. "[W]hen users enter URL addresses into their web browser using the 'http' web address format, or click on hyperlinks, they are actually telling their web browsers...which resources to request and where to find them." *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1101 (9th Cir. 2014). "Thus, the URL provides significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 at 596 (9th Cir. 2020).

**A.     Respondent's Pop-Up Cookies Window and "Privacy Preferences" Window Falsely Informed Consumers They Could Decline or Reject Targeting Cookies.**

16.     When users visited the Website, a pop-up cookies window was immediately displayed to the user. As shown in the screenshot below, the pop-up window stated that Respondent uses "cookies to enhance your experience." The pop-up cookies window contained

a link reading "Cookie settings[,]" indicating that instead of accepting all cookies, users could adjust their cookie settings by clicking the link, as shown in the screenshot below:

> We use cookies to enhance your experience. ✕
>
> Cookie settings

17.      Consistent with Claimant's typical practice and preference of managing his cookie settings to decline or reject as many cookies as possible, Claimant clicked on or selected the "Cookie settings" link, which subsequently directed him to a window titled "Privacy Preferences."[4] Respondent represented in the Privacy Preferences window that users could "choose not to allow certain types of cookies[.]" The window further enabled users to view definitions of and browse which specific cookies are "Strictly Necessary Cookies" and "Targeting Cookies," which Respondent represented were the two types of cookies in use on its Website. According to Respondent, users "cannot opt-out of our *First Party* Strictly Necessary Cookies as they are deployed in order to ensure the proper functioning of our website[.]" (emphasis added on the phrase "First Party"). Respondent also provided examples of some contexts in which Strictly Necessary Cookies may be used, including "prompting the cookie banner and remembering your settings, to log into your account, to redirect you when you log out," all of which appeared to Claimant and other Website users as shown in the following screenshot:

---

[4] This window, including its content, is referred to throughout this Complaint and Demand for Arbitration as Respondent's "Privacy Preferences window."

1

2

3

4

5

6

7

8

9

10

11



12    18.    Respondent further defined "Strictly Necessary Cookies" as those "cookies

13  necessary for the website to function…" which "do not store any personally identifiable

14  information." Respondent represented that the Strictly Necessary Cookies include two sub-

15  classes of cookies, "Performance Cookies" and "Functional Cookies." Respondent defined

16  "Performance Cookies" in relevant part as those cookies which "allow us to count visits and

17  traffic sources so we can measure and improve the performance of our site" and additionally

18  assured its users that "[a]ll information these cookies collect is aggregated and therefore

19  anonymous." Respondent defined "Functional Cookies" in relevant part as those cookies which

20  "enable the website to provide enhanced functionality and personalization" and "may be set by

21  us or by third party providers whose services we have added to our pages." Both Performance

22  Cookies and Functional Cookies are "Always Active[.]"[5]

23    19.    In contrast, Respondent defined "Targeting Cookies" as those cookies "set

24  through our site by our advertising partners" that "may be used by those companies to build a

25  profile of your interests and show you relevant adverts on other sites." Respondent also

26

27  ———————————————
   [5] The disclosure that some Functional Cookies are also set by third party providers and are
28  "Always Active" appears to contradict Respondent's previous representation that the only
   category of cookies that could not be declined were "First Party Strictly Necessary Cookies[.]"

1   represented that Targeting Cookies "do not store directly personal information" and stated that

2   users can "choose not [to] allow" these cookies. These definitions are as depicted in the

3   following screenshots:





COMPLAINT AND DEMAND FOR ARBITRATION

20.     Desiring to decline, reject, "opt out" of, or "choose not [to] allow" as many cookies as possible, especially the Targeting Cookies, which Respondent represented that its Website's users could "choose not [to] allow[,]" Claimant adjusted the settings to indicate Claimant's choice and/or agreement to decline, reject, "opt out" of, or "choose not [to] allow" all cookies, including Targeting Cookies, other than those "First Party Strictly Necessary Cookies […] deployed in order to ensure the proper functioning of [Respondent's] website[.]" Claimant then confirmed these choices by selecting or clicking the "Confirm My Choices" button, and Claimant proceeded to browse the Website. Respondent's pop-up cookies window and Privacy Preferences window led Claimant, and those similarly situated, to believe that they had declined or rejected **all categories of cookies, including Targeting Cookies, other than those cookies strictly necessary for the operation of the Website**, which Respondent expressly represented would be limited to first-party cookies. That belief, however, was false.

21.     In truth, Respondent did not abide by its users' wishes. Even though Respondent received notice that certain users, by adjusting the settings on the Privacy Preferences window to decline or reject all Targeting Cookies, did not consent to the disclosure of their personal information, nor the third-party cookies causing such disclosure, Respondent nonetheless

COMPLAINT AND DEMAND FOR ARBITRATION

placed third-party cookies, including Targeting Cookies (as Respondent itself defined and identified them), on those and other Website users' devices.

22.    Unbeknownst to Claimant, Respondent caused numerous cookies (including third-party Targeting Cookies) to be stored on Claimant's device(s), which caused Claimant's personal data to be transmitted and/or sold to third parties for targeted advertising and other purposes not required for the core function of the Website—the very same purposes Claimant had rejected in opting out of such cookies.

23.    The following screenshots show examples of the numerous third-party cookies and other data that the Website caused consumers' devices to transmit to third parties such as Facebook, Microsoft/Bing, Google/DoubleClick, LinkedIn, Salesforce, TikTok, and others— even *after* consumers adjusted the settings in the Privacy Preferences window to reject or decline all such cookies:

**[Remainder of this page intentionally left blank.]**

COMPLAINT AND DEMAND FOR ARBITRATION



COMPLAINT AND DEMAND FOR ARBITRATION



COMPLAINT AND DEMAND FOR ARBITRATION



24.    Many of the third-party cookies in these exemplar screenshots are, according to the definitions put forth in Respondent's own Privacy Preferences window, among the Targeting Cookies that Claimant and other Website users thought they had rejected. These cookies are not among the "First Party Strictly Necessary Cookies" Respondent represented "[could not] be switched off[.]" For example, Facebook cookies are used by Meta/Facebook to profile web users and serve them advertising based on their behaviors and preferences as captured and analyzed through these cookies. The Google/DoubleClick cookies and many of the cookies also shown in these screenshots function similarly.

25.     Even though Respondent disclosed the existence and use of such cookies on the Website in its pop-up cookies window, Privacy Preferences window, and Privacy Policy (inclusive of its California Privacy Policy), it did not adequately disclose that users, such as Claimant, would (and did) continue to receive such cookies even after they rejected them. Besides the clear and unequivocal statements in Respondent's Privacy Preferences window that its Website's users could "choose not to allow certain types of cookies" by adjusting their preferences, Respondent made additional representations that users of its Website could decline or reject all categories of cookies, including Targeting Cookies, other than those "Strictly Necessary" for the operation of the Website. Respondent defined each category of cookies, specifying that users could not "opt-out of [Respondent's] First Party Strictly Necessary Cookies[,]" implying that users could opt out of all other types of cookies, and identifying Targeting Cookies as those third party cookies responsible for targeted advertising. "Targeting Cookies" apparently could be declined or rejected as indicated by the presence of a toggle switch available to users through the Privacy Preferences window. Therefore, in adjusting that toggle switch to decline or reject Targeting Cookies, Claimant and users reasonably believed that Respondent's Website would not place or utilize such third-party Targeting Cookies for advertising and other purposes.

26.     *Even if* Claimant and other users knew, or should have known, that they could not really decline or reject all such third party cookies (in that they would continue to receive Strictly Necessary Cookies, inclusive of Performance Cookies and Functional Cookies, which Respondent confusingly states can include third party cookies and are "Always Active," despite also representing that the only cookies users cannot decline or reject are "First Party" Strictly Necessary Cookies), there is *nothing* in Respondent's pop-up cookies window, Privacy Preferences window, and Privacy Policy, or elsewhere, that could reasonably be construed as notice to Claimant and other users that they would continue to receive Targeting Cookies that would collect and use Claimant's and users' personal data for targeted advertising and other purposes after expressly declining or rejecting all such cookies.

27.     Unlike the Strictly Necessary Cookies Respondent purportedly uses to ensure the proper operation of the Website, Targeting Cookies allow third parties to track and collect, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; the exact date and time of the website visits; the IP address of consumers' devices; consumers' geolocation; product page visits; and data consumers supply to the Website, such as data entered into forms on the Website. The identifier data sent to the third party with this information allows that third party to correlate the data to the user or the user's device. As such, third parties can—and almost invariably do—use it to develop and enrich profiles on consumers like Claimant and target them with advertising.

28.     The Targeting Cookies on the Website enable third parties, like Facebook, Microsoft/Bing, Google/DoubleClick, LinkedIn, Salesforce, TikTok, and others, to link individual users and devices with data regarding specific browsing activity on the Website.

29.     The Targeting Cookies that Respondent wrongfully placed on users' devices enable third parties to track users' browsing history on the Website. Every time a user visits a new page on the Website, even after declining or rejecting all such cookies, more data regarding users' browsing activity is sent to third parties, alongside the cookie data.

**B.     Third Parties Exploit Data Received from the Cookies on the Website**.

30.     The more webpages a user browses and interacts with on the Website, the more data third parties amass about the user. The Targeting Cookies that Respondent wrongfully allows to be stored on users' devices and browsers enable third parties to compile a vast repository of consumers' browsing activity, including Claimant's, and to receive access to information that is otherwise unknowable. These third parties leverage the wrongfully collected information to their advantage, using it to compile browsing histories and habits into personal profiles on consumers, which are sold to advertisers to generate revenue and target advertising to users like Claimant. In particular, third-party cookies, such as those from the Website, allow third parties to draw inferences from information collected about users' browsing and search history on the Website to create profiles about consumers reflecting the consumer's preferences,

characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

31.    For example, Meta, whose Facebook cookies appear on the Website, provides internet advertising in the manner described and alleged above. Facebook cookies, among other things, collect data about the user, such as user demographics and/or user behaviors, to create and update a profile of the user to fit the preferences of the user. These cookies can attribute such information to individual users by way of their Facebook user ID or account, which often identifies users by name, thus creating a dossier about the individual.

32.    Likewise, DoubleClick (which is owned by Google) is the largest provider of internet advertising. DoubleClick cookies, such as those found on the Website, among other things, collect data about the Website's users, such as user demographics and/or user behaviors, to create and update a profile of the user to fit the preferences of the particular user. Even though Respondent represents in the Privacy Preferences window that its Targeting Cookies "do not store directly personal information," advertisers such as DoubleClick and the other third-party cookie companies cause the sharing and sale of users' personal information by way of these cookies.

33.    Just as the data that the third-party cookies collect from Website users is valuable to Meta, Google, and other third-party cookie companies, it is valuable to Respondent as well. Data about users' browsing history enables Respondent to spot patterns in users' behavior on the Website and their interests in, among other things, specific automotive services, which it learns based on data users provide to Respondent as they browse the Website.

34.    Targeting Cookies, such as the cookies Respondent falsely claimed that Claimant and other Website users could reject, are particularly useful for Respondent's advertising. For instance, if Respondent wanted to market certain automotive services to users, Respondent could use Targeting Cookies to monitor which consumers visit the webpages that relate to specific services, or infer what services may be of interest to specific users based on the data users provide to Respondent. Respondent can then advertise such services to those same users across the internet.

35.     Respondent's own Privacy Policy admits as much. It states, among other things:

Some content or applications, including advertisements, on the Website are served by third-parties, including advertisers, ad networks and servers, content providers, and application providers. These third parties may use cookies alone or in conjunction with web beacons or other tracking technologies to collect information about you when you use our Website.

The information they collect may be associated with your Personal Information or they may collect information, including Personal Information, about your online activities over time and across different websites, and other online services. They may use this information to provide you with interest-based (behavioral) advertising or other targeted content, and/or improve the quality of your website experience, the performance of our advertisements, facilitate engagement with you and display information to you.

We also share information that we collect from you, such as your email (in hashed form), IP address or information about your browser or operating system, with them. Some of these partners return an online identification code that we may store in our first-party cookie for our use in online and cross-channel advertising and it may be shared with advertising companies to enable interest-based aka targeted aka behavioral advertising.

36.     Likewise, Respondent's own California Privacy Policy states, among other things:

We may also share the above categories of Personal Information, excluding Sensitive Personal Information, with advertising platforms and data aggregation and brokerage companies for cross-context behavioral advertising purposes, improving the quality of your website experience, the performance of our advertisements, facilitate engagement with you and display relevant information to you.

## C.     The Intercepted Data Is Valuable.

37.     The information that the third-party cookie companies intercept, collect, and track about users through the third-party cookies Respondent causes to be placed on users' devices carries significant economic value. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium." *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004). Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from

the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

38.     The value of the consumers' personal information provided to third parties through the cookies Respondent wrongfully placed can be quantified. For instance, in one study, researchers evaluated the value that 180 internet users placed on keeping personal data secure. Participants valued web browsing history at $52.00 per year. Similarly, they valued web search history at $57.00 per year.



39.     Similarly, the value of user-correlated web browsing history can be quantified because companies are willing to pay users for the exact type of data that the third parties here intercepted and collected—without permission—through the cookies on the Website. For example, Google Inc. operates a consumer research panel called "Google Screenwise Trends" which, according to Google, is designed "to learn more about how everyday people use the Internet."

40.     As part of the program, panel participants add a browser extension that shares with Google the websites that users visit and how the panelists use them. The panelists **<u>consent</u>** to Google tracking this information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.

41.     After a panelist participates for three months, Google offers to pay additional gift cards "for staying with" the panel. These gift cards, valued at or around $5, demonstrate conclusively that internet industry participants understand the enormous value in internet users' browsing habits. Google has subsequently offered to pay Screenwise participants up to $3 per week to be tracked.

42.     Other platforms have recently developed that offer consumers the opportunity to directly monetize their own data. Killi, for instance, is a data exchange platform that allows consumers to own and earn income from their data.[6] Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[7]

43.     The Nielsen Company is another example. Nielsen has extended its reach to computers and mobile devices through the Nielsen Computer and Mobile Panel. After a consumer installs Nielsen's application on his or her computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks user's activity. In return, Nielsen enters users into sweepstakes with monetary benefits and compensates users with points worth up to $50 per month.[8]

44.     Technology companies recognize the monetary value of users' sensitive, personal information insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[9]

---

[6] https://killi.io/about-us/

[7] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

[8] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[9] Kari Paul, Google launches app that will pay users for their data, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study; Saheli Roy Choudhury and Ryan Browne, Facebook pays teens to install an app that could collect all kinds of data, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html; Jay Peters, Facebook will now pay you for your voice recordings, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proununciations-app.

45.    The California Consumer Privacy Act ("CCPA") recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers who opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

46.    Through its false representations and unlawful data collection and dissemination, Respondent has unjustly enriched itself while depriving consumers of their ability to choose if and how they wish to monetize their personal data.

## CLAIMANT'S EXPERIENCES

47.    During the last year, Claimant visited the Website while located in the state of California and viewed content available on the Website.

48.    When Claimant visited the Website, he was presented with Respondent's pop-up cookies window, which stated that Respondent's Website "use[s] cookies to enhance your experience[,]" followed by a hyperlink titled "Cookie settings" that users could select or click.

49.    Consistent with his typical practice in managing website cookie settings to decline or reject as many cookies as possible, Claimant clicked on or selected the "Cookie settings" link, which subsequently directed him to a window titled "Privacy Preferences." The Privacy Preferences window represented that Website users could "choose not to allow certain types of cookies[.]" Claimant saw that he could ***not*** "opt-out" of "First Party Strictly Necessary Cookies," which are those "deployed in order to ensure the proper functioning of [the] website."

50.    Even though Respondent's Privacy Preferences window disclosed that the Website sets "First Party Strictly Necessary Cookies," from which users cannot "opt out," the same Privacy Preferences window also stated that users can "choose not to allow certain types of cookies[.]" Thus, when Claimant adjusted the settings on the Privacy Preferences window to

"opt out" of Targeting Cookies—the only category or type of cookies he could choose not to allow—he reasonably expected that all such Targeting Cookies would be rejected. Moreover, Claimant also reasonably expected, based on Respondent's representations, that the only cookies he would receive or that the Website would use as he browsed the Website after adjusting these settings would be "*First Party* Strictly Necessary Cookies." (emphasis added). Because of this, Claimant also reasonably expected that Respondent would not use his personal data for targeted advertising purposes, nor would Respondent collect, share, or sell his personal data or personal information through third-party cookies. Respondent's pop-up cookies window and Privacy Preferences window led Claimant, and other Website users, to believe that they declined, rejected, or opted out of all categories of cookies, including Targeting Cookies, other than those first-party cookies strictly necessary for the operation of the Website.

51.     Claimant believed that declining or rejecting all Targeting Cookies would keep his communications with the Website private. After adjusting the toggle switch setting on the Targeting Cookies tab to indicate his choice/agreement to decline or reject all Targeting Cookies, Claimant selected or clicked the "Confirm My Choices" button.

52.     By declining or rejecting all Targeting Cookies, Claimant gave Respondent notice that he did not consent to the placement of such third-party cookies from the Website. In reliance on Respondent's representations and promises, only then did Claimant continue browsing the Website.

53.     Despite the fact that Claimant declined or rejected all Targeting Cookies, unbeknownst to him, Respondent nonetheless continued to cause the placement of third-party Targeting Cookies, including those from Facebook, Microsoft/Bing, Google/DoubleClick, LinkedIn, Salesforce, TikTok, along with many others, on his device. In doing so, Respondent caused the transmission of private communications and data to third parties as Claimant browsed the Website.

54.     Respondent's representation that consumers could "choose not to allow certain types of cookies" was untrue and, through the statements and options presented in its Privacy Preferences window, Respondent led Claimant to reasonably (but falsely) believe that he could

decline or reject all categories of cookies, including Targeting Cookies, other than first-party Strictly Necessary Cookies. Had Claimant known this fact, he would not have used the Website.

55.    Moreover, Claimant reviewed the pop-up cookies window and Privacy Preferences window prior to using the Website. Had Respondent disclosed that it would continue to cause such Targeting Cookies to be stored on consumers' devices even when they choose to decline or reject all such cookies, Claimant would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

56.    Claimant continues to desire to browse the Website and would like to browse other, similar websites that do not misrepresent that users can decline or reject Targeting Cookies, as well as any other unwanted cookies. If the Website was reconfigured to honor users' request to decline or reject all such cookies, Claimant would likely browse the Website again in the future but will not do so until then.

57.    Claimant regularly visits websites that feature content similar to that of the Website. Because Claimant does not know how the Website is configured, which can change over time, and cannot test whether the Website honors users' requests to decline or reject Targeting Cookies, Claimant will be unable to rely on Respondent's representations when browsing the Website in the future absent an injunction that prohibits Respondent from making misrepresentations on its Website.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Invasion of Privacy Under California's Constitution

58.    Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

59.    California's constitution creates a right to privacy, and further creates a right of action against private entities such as Respondent.

60.     The principal purpose of this constitutional right is to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Respondent.

61.     Article I, Section 1 of the California Constitution provides:

"All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property and pursuing and obtaining safety, happiness, and privacy."

62.     The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Proposition 11 was intended to curb businesses' control over the unauthorized collection and use of peoples' personal information, as the ballot argument stated:

The right of privacy is the right to be left alone . . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.[10]

63.     This amended constitutional provision addresses the concern over accelerating encroachment on personal freedom and security caused by increasing surveillance and data collection activity in contemporary society. Its proponents meant to afford individuals more measures of protection against this growing threat to personal privacy:

Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.[11]

In recognizing these privacy rights, the California Constitution provides insight into and serves to define the nature of the reasonable expectation of privacy of an objectively reasonable

---

[10] Ballot Pamp., Proposed Stats. & Amends. To Cal. Const. With Arguments to Voters. Gen. Election *26 (Nov. 7, 1972).
[11] *Id.*

California resident.

64.    To plead a California constitutional privacy claim, Claimant must show an invasion of (i) a legally protected privacy interest; (ii) where Claimant had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Respondent constituting a serious invasion of privacy.

65.    Respondent has intruded upon the following legally protected privacy interests of Claimant: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Claimant's Fourth Amendment right to privacy. Claimant has a reasonable expectation of privacy in the conduct of his life, including his internet browsing activities and in the electronic communications and exchange of personal data with Respondent, since, among other things, Respondent affirmatively promised Claimant that he could "choose not to allow certain types of cookies," and, through the statements and options presented in its Privacy Preferences window, Respondent further led Claimant to reasonably believe that he could decline or reject all categories of cookies, including Targeting Cookies, other than first-party Strictly Necessary Cookies. Claimant directed his electronic devices to access the Website. When Claimant was presented with the Privacy Preferences window on the Website, he reasonably expected that his action to decline or reject all categories of cookies, including Targeting Cookies, other than those first-party cookies strictly necessary for the operation of the Website, would be honored. That is, he reasonably believed that Respondent would not cause the placement of such cookies while he browsed the Website. Claimant also reasonably expected that, if he rejected such cookies, Respondent would not share his communications and data with third parties or collect such data itself, especially based on Respondent's representation that first-party Strictly Necessary Cookies were the only category of cookies that could not be declined or rejected. Claimant further reasonably expected that the Website would not cause his browser to store and send cookies and other data to third parties, which then used that data to track Claimant's activity, such as the URLs being browsed

by Claimant as well as the referrer URL; webpage title; webpage keywords; the exact date and time of the Website visits; the IP address of Claimant's computer; product page visits; and/or data that Claimant supplied to the Website. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

66.     Respondent, in violation of Claimant's reasonable expectation of privacy, allowed third-party cookie companies to collect, track, and compile the web browsing activity and communications of Website users, including Claimant. The data that Respondent allowed third parties to collect enabled third parties to assemble comprehensive profiles of Claimant's life. Those profiles can be, and are, used to further invade Claimant's privacy, by, *inter alia*, allowing third parties to learn intimate details of Claimant's life, and target him for advertising and other purposes as described herein, thereby harming Claimant through the abrogation of Claimant's autonomy and ability to control dissemination and use of his personal information.

67.     Respondent's actions constituted a serious invasion of privacy in that those actions invaded a zone of privacy protected by the Fourth Amendment—i.e., one's personal communications—and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

68.     Respondent's intrusion into Claimant's privacy was also highly offensive to a reasonable person in that Respondent violated criminal and civil laws designed to protect individual privacy and against theft.

69.     The surreptitious and unauthorized disclosure of the internet activity and communications of thousands, if not millions, of consumers constitutes an egregious breach of social norms.

70.     Respondent lacked a legitimate business interest in causing the placement of third-party cookies that allowed third-party companies, including marketing, advertising, and

social media companies, to track, intercept, receive, and collect data about users and their browsing history without their consent.

71.    Claimant has been damaged by Respondent's invasion of his privacy and is entitled to just compensation, including disgorgement of profits related to the unlawful tracking, and injunctive relief.

## SECOND CAUSE OF ACTION

### Violation of the California Invasion of Privacy Act

### California Penal Code § 631

72.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

73.    California Penal Code § 631(a), which prohibits wiretapping, provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

74.    To establish liability under § 631(a), a Claimant need only establish that Respondent, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

Cal. Penal Code § 631(a).

75.    Respondent is a "person" within the meaning of California Penal Code § 631.

76.    Under § 631(a), Respondent must show it had the consent of all parties to a communication.

77.    Respondent did not have the consent of all parties to learn the contents of or record Claimant's private communications. Respondent also did not have consent to allow third parties to learn the contents of or record Claimant's private communications.

78.    Respondent utilizes software code on the Website that allows third parties to intercept Claimant's private communications and web activity on the Website.

79.    The Website causes the user's browser to store cookies from third parties, and to transmit those cookies alongside other data—such as button clicks, and specific URL visits—to the third party. By configuring the Website in this manner, Respondent intentionally accessed, intercepted, read, learned, and/or collected the electronic communications of Claimant, and aided and abetted the third-party cookie companies, including, but not limited to, Facebook, Microsoft/Bing, Google/DoubleClick, LinkedIn, Salesforce, and TikTok, among many others, to access, intercept, read, learn, and/or collect the electronic communications of Claimant as well.

80.    Section 631(a) is not limited to phone lines, but also applies to "new technologies," such as computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir.

2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

81.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and even if they do not, Respondent's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner"): (i) the Website, including the software code modules therein that are designed to cause the transmission of consumers' communications and web activity to third-parties; (ii) the third-party cookies on the Website; (iii) Respondent's computer servers, including the software code modules installed on and/or served by those servers, used to place cookies and/or intercept, aid and abet others to intercept, receive, transmit, read, track, and analyze Claimant's communications; and (iv) the plan Respondent carried out to place cookies and/or intercept, aid and abet others to intercept, collect, transmit, read, and track Claimant's communications, even though Claimant explicitly declined such actions (collectively, the "Safelite Instruments").

82.    The private communications that were intercepted, collected, transmitted, received, tracked, and analyzed by the Safelite Instruments alleged above included the following:

- internet IP address of consumers' devices;
- the URLs browsed by users of the Website, as well as the referrer URL;
- the title of webpage viewed;
- webpage keywords;
- the exact date and time of the website visits; and
- device identifiers.

(Collectively, the information listed in the bullet points above shall be referred to as "Private Communications.")

83.    By enabling the Safelite Instruments to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications without Claimant's consent, and by aiding and abetting third parties to intercept, collect, transmit, receive, track, and analyze such Private Communications, Respondent violated Section 631(a) of the CIPA. In particular, Respondent:

- intentionally tapped, electrically or otherwise, the lines and/or instruments of internet communication being used by Claimant to access the Website;

- intentionally made unauthorized connections, electrically or otherwise, with the lines and/or instruments of internet communication being used by Claimant to access the Website and allowed third parties to do so;

- willfully, and without the consent of Claimant, read and learned the contents and/or meaning of Claimant's messages and communications containing Private Communications, while the same was in transit or passing over lines of internet communication, or was being sent from and received at locations in California and allowed third parties to do so;

- used Claimant's Private Communications to increase Respondent's profits;

- allowed third parties to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications; and

- aided, agreed with, and conspired with other persons (including, without limitation, Meta, Microsoft, Google, and other third-party cookie companies) to unlawfully do, permit, and cause to be done the above-listed activities.

84.     Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

85.     Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because Claimant frequently uses the internet to search for information related to Respondent's services, as well as other services related to automotive glass repair. Claimant continues to desire to use the internet for that purpose. Claimant has no practical way to know if his request to opt out of cookies or if his declination or rejection of those cookies will be honored and/or whether his actions on the Website will be monitored or recorded by Respondent. Further, Respondent and third parties have already intercepted Claimant's Private Communications, and are currently sharing, and will continue sharing, that information with additional third parties, unless and until enjoined.

86.    Claimant seeks all relief available under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

### THIRD CAUSE OF ACTION

**Violation of the California Invasion of Privacy Act**

**California Penal Code § 635**

87.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

88.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

89.    California Penal Code § 635 provides as follows:

> Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another, or any device which is primarily or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones or between a cellular radio telephone and a landline telephone in violation of Section 632.5, or communications between cordless telephones or between a cordless telephone and a landline telephone in violation of Section 632.6 , shall be punished by a fine not exceeding two thousand five hundred dollars.

90.    Respondent intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished one or more wiretap devices (i.e., the Safelite Instruments, including the software code modules therein) primarily or exclusively designed or intended for eavesdropping upon the communication of another (i.e., Claimant).

91.    In particular, the Safelite Instruments contain software code modules that are primarily or exclusively designed to enable third parties to intercept, collect, transmit, receive, and track communications that users reasonably (but erroneously) believed would be sent

directly and exclusively to Respondent. Further, even though Claimant intended to reject or opt out of all Targeting Cookies, the software code modules of the Safelite Instruments were designed to—and in fact did—cause the placement of such cookies and software code which were used to intercept, collect, transmit, receive, track, analyze, and sell users' Private Communications to third parties.

92.    Claimant did not consent to any of Respondent's actions in implementing the wiretaps.

93.    Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

94.    Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because he frequently uses the internet to search for information about, among other things, Respondent's services and other services related to automotive glass repair. Claimant continues to desire to use the internet for that purpose, including for the purpose of viewing content related to Respondent's services and similar services. Claimant has no practical way to know if his request to opt out of cookies or his declination or rejection of those cookies will be honored and/or whether his actions on the Website will be monitored or recorded by Respondent. Further, Respondent has already collected his Private Communications, and is currently sharing, and will continue sharing, that information with third parties, unless and until enjoined.

95.    Claimant seeks all relief available under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

**FOURTH CAUSE OF ACTION**

**Violation of the California Comprehensive Computer Data Access and Fraud Act**

**California Penal Code § 502**

96.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

97.    Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer

system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Devices with web browsers are "computers" within the meaning of the statute.

98.     Respondent violated Cal. Penal Code § 502(c) by, among other things, (i) knowingly causing Claimant's and other users' computers to be accessed through third-party cookies and third-party software code that causes the transmission of users' data to be transmitted to third-party cookie companies; (ii) knowingly accessing and without permission using Claimant's and other users' data and computers to devise or execute any scheme or artifice to defraud and/or deceive, and wrongfully obtain data; and (iii) knowingly accessing and without permission making use of data from Claimant and other users' computers as well as allowing third-parties to do so.

99.     Despite Respondent's false representations to the contrary, Respondent was unjustly enriched by acquiring Claimant's sensitive and valuable personal information without permission and using it for Respondent's own financial benefit. Claimant retains a stake in the profits Respondent earned from Claimant's personal browsing history and other data because, under the circumstances, it is unjust for Respondent to retain those profits.

100.     Respondent allowed third parties and itself to access, copy, take, analyze, and use data from Claimant's devices while he was in the State of California. Accordingly, Respondent is deemed to have accessed Claimant's devices in California.

101.     As a direct and proximate result of Respondent's unlawful conduct within the meaning of Cal. Penal Code § 502, Respondent has caused loss to Claimant and has been unjustly enriched.

102.     Claimant seeks compensatory damages and/or disgorgement, and declarative, injunctive, or other equitable relief.

103.     Claimant is entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Respondent's violations were willful and, upon information and belief, Respondent is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

104.    Claimant is also entitled to recover reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

**FIFTH CAUSE OF ACTION**

**Violation of the California False Advertising Law,**

**Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL")**

105.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

106.    Beginning at an exact date unknown to Claimant, but within four (4) years preceding the filing of this Complaint, Respondent, with the intent to directly or indirectly perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before the public and Claimant statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which Respondent knew, or in the exercise of reasonable care should have known, were untrue or misleading, in violation of the FAL. In particular, Respondent made untrue, false, deceptive, and/or misleading statements in connection with its pop-up cookies window and Privacy Preferences window.

107.    Respondent's pop-up cookies window and Privacy Preferences window assert facts about Respondent's services that are untrue and likely to deceive and mislead the public and reasonable consumers. In particular, Respondent made representations and statements (by omission and commission) that:

a.    The pop-up cookies window contained a link reading "Cookie settings[,]" indicating that instead of accepting all cookies, users could adjust their cookie settings by visiting the link;

b.    Users of Respondent's Website can "choose not to allow certain types of cookies," as found in the Privacy Preferences window;

c.    Users of Respondent's Website "cannot opt-out of [Respondent's] First Party Strictly Necessary Cookies[,]" and, by implication, the only Strictly Necessary Cookies placed by or used on the Website when users choose to opt-out of all

other categories of cookies are first-party cookies from Respondent itself, as found in the Privacy Preferences window;

d. "Strictly Necessary Cookies" are those "necessary for the website to function and cannot be switched off in [Respondent's] systems…these cookies do not store any personally identifiable information[,]" as found in the Privacy Preferences window; and

e. "Targeting Cookies" are those "cookies [that] may be set through [Respondent's] site by [Respondent's] advertising partners. They may be used by those companies to build a profile of [users'] interests and show [users] relevant adverts on other sites. They do not store directly personal information[.]" Users can opt-out of, or otherwise decline or reject, these cookies by adjusting the toggle setting on the Targeting Cookies tab, as suggested by the form, appearance, and placement of the toggle setting in the Privacy Preferences window.

108. These representations led reasonable Website users to believe that they could reject all such cookies and, in doing so, Respondent would not cause the placement of third-party cookies on consumers' devices and browsers for targeted advertising purposes, nor could third parties collect, receive, intercept, and compile data about users' browsing activity and Private Communications from the Website. Respondent had a duty to disclose that, despite consumers election to reject such cookies, the Website would nonetheless cause the user's browser to store such cookies and send data to third parties, who can then use that data to track the user's activity and target them with advertising.

109. Claimant relied to his detriment on Respondent's false, misleading, and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Relying on Respondent's misrepresentations about its services—specifically its false and misleading representation that users could "choose not to allow certain types of cookies[,]" along with its provision of an apparent option to decline or reject all categories of cookies, including Targeting Cookies (other than first-party Strictly Necessary Cookies), among other representations, Claimant used the Website.

110. Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of Claimant's personal information and communications.

111. Respondent's representations that consumers could "choose not to allow certain types of cookies" and the apparent option to decline or reject all categories of cookies, including Targeting Cookies (other than first-party Strictly Necessary Cookies), among other representations, were untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the pop-up cookies window and Privacy Preferences window prior to using the Website. Had Respondent disclosed that it caused such Targeting Cookies to be stored on consumers' devices, even when they choose to opt out of such cookies, or expressly decline or reject those cookies, Claimant would have noticed it and would not have used the Website.

112. Respondent's acts and omissions are likely to deceive the general public.

113. Respondent engaged in these false, misleading, and deceptive advertising and marketing practices to increase its profits. Respondent generated revenue by using the wrongfully collected information to, among other things, engage in targeted advertising.

114. Accordingly, Respondent has engaged in false advertising, as defined and prohibited by Section 17500, *et seq.* of the California Business and Professions Code.

115. The aforementioned practices, which Respondent used, and continues to use, to its significant financial gain also constitute unlawful competition and provide an unlawful advantage over Respondent's competitors as well as injury to the general public.

116. Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information, which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his Private Communications and data.

117. Respondent's actions caused damage to and loss of his property right to control the dissemination and use of his personal information and communications.

COMPLAINT AND DEMAND FOR ARBITRATION

118.    Claimant seeks a declaration that the above-described practices constitute false, misleading, and deceptive advertising.

119.    Claimant seeks full restitution to Claimant of monies, as necessary and according to proof, to restore any and all monies acquired by Respondent to Claimant by means of the false, misleading, and deceptive advertising and marketing practices complained of herein, plus interest thereon.

120.    Claimant seeks an injunction to prohibit Respondent from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein. Such misconduct by Respondent, unless and until enjoined and restrained, will continue to cause injury in fact to the general public and the loss of money and property in that Respondent will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Respondent to which they are not entitled. Claimant has no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## SIXTH CAUSE OF ACTION

### Violation of the California Unfair Competition Law,

### Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL")

121.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

122.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By engaging in the aforementioned practices, Respondent has violated the UCL.

123.    Respondent is a "person" under Cal. Bus. & Prof. Code § 17201.

124.    Respondent created and implemented a scheme to obtain and share the Private Communications and private web activity from web users through a pervasive pattern of false and misleading misrepresentations and omissions. Respondent misrepresented to Claimant and other web users that they could "choose not to allow certain types of cookies" and provided the

apparent option to decline or reject all categories of cookies, including Targeting Cookies (other than first-party Strictly Necessary Cookies), among other representations, when, in fact, Respondent caused such Targeting Cookies to be placed on consumers' devices and browsers, even after users rejected those cookies. Respondent concealed and failed to disclose to Claimant and other Website users that it would cause such cookies and software code to be stored on consumers' devices and browsers, which would cause the interception and transmission of data about users' activity on the Website and Private Communications to third parties and Respondent, despite consumers' clear refusal of such cookies. Further, Respondent failed to adequately disclose to Claimant and Website users that these third-party cookies enable third parties to track consumers' behavior across the Website and use that data to compile profiles of consumers for targeted advertising purposes, even after such cookies are rejected. In particular, the third-party cookies that Respondent wrongfully placed on consumers' devices and browsers enabled third parties and Respondent to track and collect consumers' Private Communications and browsing history on the Website. With this information, third parties can—and almost invariably do—develop and enrich profiles on consumers, like Claimant, to, among other things, target advertising to them.

125.    These representations and omissions were misleading and deceptive.

126.    Respondent's conduct was unfair and unconscionable, particularly because Respondent allowed third parties to intrude on communications that users reasonably believed to be private, and because Respondent made users' Private Communications available to third parties, despite representing that Website users could "choose not to allow certain types of cookies" and provided users the apparent option to decline or reject all categories of cookies, including Targeting Cookies (other than first-party Strictly Necessary Cookies), among other representations. Respondent also shared users' personal data for targeted advertising purposes, despite its representations to the contrary.

127.    Respondent's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers. Reasonable consumers, including Claimant, would have found it material to their

decisions to use the Website that Respondent would intercept, collect, transmit, receive, track, and analyze consumers' Private Communications against their wishes and without their consent, and make those Private Communications available to third parties via cookies despite their clear rejection of such cookies and such uses of their Private Communications. Knowledge of these facts would have been a substantial factor in the consumers' decisions to use the Website.

128.    Respondent's acts and practices constitute a continuing and ongoing unfair business activity defined by the UCL. Respondent's conduct is contrary to the public welfare as it transgresses civil and criminal statutes of the State of California designed to protect individuals' constitutional and statutory rights to privacy, violates established public policy, and has been pursued to attain an unjustified monetary advantage for Respondent by creating personal disadvantage and hardship to users of the Website. As such, Respondent's business practices and acts have been immoral, unethical, oppressive, and unscrupulous and have caused injury to customers far greater than any alleged countervailing benefit. The harm to consumers, which includes the interception of their communications by third parties, the wrongful collection and tracking of consumers' Private Communications, and the construction of profiles about consumers that third parties and Respondent use for their monetary gain, far outweigh the value of Respondent's conduct (i.e., the wrongful placement of unwanted third-party cookies on consumers' devices and browsers even when consumers reject or opt out of such cookies).

129.    Further, Respondent's "unfair" acts and practices include its violation of property, economic, and privacy interests protected by the statutes identified above. To establish liability under the unfair prong, Claimant need not establish that these statutes were actually violated, although the claims pleaded herein do so.

130.    Respondent owed Claimant a duty to disclose these facts because they were exclusively known and/or accessible to Respondent, who had superior knowledge of its activities with respect to the Private Communications of Claimant and users; because Respondent actively concealed the facts; and because Respondent intended for consumers to rely on the omissions in question. Moreover, Respondent's omissions were contrary to representations that Respondent actually made to consumers that they could "choose not to allow certain types of cookies" and

the apparent option to decline or reject all categories of cookies, including Targeting Cookies (other than first-party Strictly Necessary Cookies), among other representations, as well as in using Website users' personal data for targeted advertising purposes, contrary to its representations.

131.    Claimant relied on Respondent's misrepresentations and omissions. Reasonable consumers would have relied on Respondent's promise to consumers that they could "choose not to allow certain types of cookies" and decline or reject all categories of cookies, including Targeting Cookies, other than first-party Strictly Necessary Cookies, and, in light of those promises, and others, would have relied on the misrepresentations and omissions, particularly because Respondent made representations to the contrary and consumers were not informed that Respondent would cause such Targeting Cookies to be stored on consumers' devices and browsers, despite consumers' clear rejection of Targeting Cookies.

132.    Respondent's conduct was also unlawful in that it violated the following statutes: the California Invasion of Privacy Act, Cal. Penal Code §§ 502, 630–638; the FAL; and the CLRA. Respondent's conduct also breached the promises Respondent made in its Privacy Preferences window.

133.    Moreover, Respondent's conduct was unlawful and violated California's Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.*, which sets strict standards regarding the collection, use, retention, sharing, and sale of "personal information," including but not limited to, §§ 1798.100(a), (b), (c), (e), 1798.110, 1798.115, 1798.120, 1798.130.

134.    For instance, Respondent violated Cal. Civ. Code § 1798.100(a) and § 1798.115 by (a) informing consumers that they could decline or reject all categories of cookies, including Targeting Cookies, other than those first-party Strictly Necessary Cookies required for the operation of the Website, but, nonetheless, causing such cookies to be placed on users' devices and browsers and causing the transmission of consumers' Private Communications to third parties after users declined or rejected such cookies; (b) failing to inform consumers that third parties would collect their Private Communications after rejecting or opting out of such cookies; and (c) failing to inform consumers that third-party cookie companies would use data collected

to compile profiles on consumers after rejecting or opting out of such cookies. Respondent further violated Cal. Civ. Code § 1798.100(e) because Respondent collects consumers' personal information and does not implement reasonable security procedures and practices appropriate to the nature of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure in accordance with Cal. Civ. Code § 1798.81.5. Such security procedures Respondent could have implemented could have been to simply honor consumers' requests to reject or opt out of such cookies.

135.    Respondent also violated Cal. Civ. Code § 1798.120 because it received direction from Claimant and other users not to sell their personal information when they chose to reject or opt out of all such cookies, but Respondent nonetheless caused such third-party cookies to be placed on Claimant and other users' devices and browsers, and thereby sold their Private Communications to third parties.

136.    Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information, which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

137.    Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and Private Communications.

138.    Respondent's representations that consumers could decline or reject all categories of cookies, including Targeting Cookies, other than those first-party cookies strictly necessary for the operation of the Website, if they elected to do so, was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the pop-up cookies window and Privacy Preferences window prior to using the Website. Had Respondent disclosed that it causes such Targeting Cookies to be stored on consumers' devices, even after they choose to decline or reject such cookies, Claimant would have noticed it and would not have used the Website.

139.     The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Respondent's business. Respondent's wrongful conduct is part of a pattern or generalized course of conduct that was, and still is, perpetuated and repeated in the State of California.

140.     Claimant, on behalf of himself and the general public, seeks restitution, injunctive relief, and reasonable attorneys' fees, as well as any other relief deemed proper.

## SEVENTH CAUSE OF ACTION

### Violation of the Consumers Legal Remedies Act

### California Civil Code §§ 1750, *et seq.* ("CLRA")

141.     Claimant realleges and incorporates by reference all paragraphs alleged herein.

142.     Respondent's actions, representations, and conduct described herein have violated, and continue to violate, the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

143.     Claimant, and other Website users, are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

144.     The Website and Respondent's online platform services are "services" under the CLRA.

145.     Respondent's representations, set forth in this Complaint and Demand for Arbitration, led Website users to falsely believe that they could decline or reject all categories of cookies, including Targeting Cookies, other than those first-party cookies strictly necessary for the operation of the Website. Website users further believed that, in doing so, Respondent would not cause such cookies and third-party software code to be placed on consumers' devices to cause the transmission of consumers' web activity and Private Communications to third parties (which allow Respondent and third parties to track consumers' behavior on the Website). By engaging in the actions, representations, and conduct set forth in this Complaint, Respondent has violated, and continues to violate, § 1770(a)(5), § 1770(a)(7), and § 1770(a)(9) of the CLRA.

146.    In violation of California Civil Code § 1770(a)(5), Respondent's acts and practices constitute improper representations that its Website service has sponsorship, approval, characteristics, uses, or benefits, which it does not have. In violation of California Civil Code § 1770(a)(7), Respondent's acts and practices constitute improper representations that its Website service is of a particular standard, quality, or grade, when it is of another. In violation of California Civil Code § 1770(a)(9), Respondent has advertised services with intent not to sell them as advertised.

147.    Claimant requests that Respondent be enjoined from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Respondent is not restrained from engaging in these types of practices in the future, Claimant and users will continue to suffer harm. Claimant has no adequate remedy at law to stop Respondent's continuing practices.

148.    On or about February 9, 2024, Claimant provided Respondent with notice and a demand to correct, or otherwise rectify, the unlawful, unfair, false, and/or deceptive practices complained of herein. Despite receiving the notice and demand, Respondent failed to do so. Among other things, Respondent failed to identify consumers, notify them of their right to remedies under the CLRA, and/or to provide that remedy. Accordingly, Claimant seeks, pursuant to California Civil Code § 1780(a)(3), compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Respondent's acts and practices.

149.    Claimant also requests that he be awarded costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## EIGHTH CAUSE OF ACTION

### Intrusion Upon Seclusion

150.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

151.    To assert a claim for intrusion upon seclusion, Claimant must plead (i) that Respondent intentionally intruded into a place, conversation, or matter as to which Claimant had

a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

152.    By causing unwanted cookies to be stored on consumers' devices, which enabled third parties to intercept, collect, transmit, receive, track, and analyze consumers' internet activity and Private Information in violation of Respondent's representations that consumers could "choose not to allow certain types of cookies" and could decline or reject all categories of cookies, including Targeting Cookies, other than first-party Strictly Necessary Cookies, among other representations, Respondent intentionally intruded upon the solitude and/or seclusion of users in that Respondent effectively placed third parties, including, but not limited to, Facebook, Microsoft/Bing, Google/DoubleClick, LinkedIn, Salesforce, and TikTok, among many others, in the middle of communications to which they were not invited, welcomed, or authorized.

153.    The tracking and access caused by the cookies that Respondent caused to be stored on consumers' devices was not authorized by Claimant, and, in fact, Claimant specifically chose to reject such cookies.

154.    Claimant had an objectively reasonable expectation of privacy surrounding his communications and web browsing activity on the Website based on Respondent's promise that users could "choose not to allow certain types of cookies" and could decline or reject all categories of cookies, including Targeting Cookies (other than first-party Strictly Necessary Cookies), among other representations, as well as state criminal and civil laws designed to protect individual privacy.

155.    Respondent's intentional intrusion into Claimant's internet communications and web browsing history would be highly offensive to a reasonable person given that Respondent represented that consumers could "choose not to allow certain types of cookies" and could decline or reject all categories of cookies, including Targeting Cookies (other than first-party Strictly Necessary Cookies), among other representations, when, in fact, it caused those cookies to be stored on consumers' devices and browsers even after consumers declined, rejected, or opted out of all such cookies. Indeed, Claimant reasonably expected, based on Respondent's

false representations, that Respondent would not cause such cookies to be stored on Claimant's devices or cause the transmission of Claimant's internet activities to third parties.

156. Respondent's conduct was intentional and intruded on Claimant's communications which constitute private searches, web browsing activity, and other data.

157. Claimant has been damaged as a direct and proximate result of Respondent's invasion of his privacy and is entitled to just compensation. Respondent's invasion of privacy caused Claimant to suffer damages, including, but not limited to:

    a.    Nominal damages;

    b.    General damages for invasion of his privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

    c.    Sensitive and confidential information that Claimant intended to remain private is no longer private; and

    d.    Respondent and the third-party cookie companies took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value.

158. Claimant seeks appropriate relief for that injury, including but not limited to, damages that will reasonably compensate him for the harm to his privacy interests as well as disgorgement of profits made by Respondent as a result of its intrusions upon Claimant's privacy.

## <u>NINTH CAUSE OF ACTION</u>

### Breach of Contract

159. Claimant realleges and incorporates by reference all paragraphs alleged herein.

160. Respondent's relationship with its users is governed by the Website's pop-up cookies window and Privacy Preferences window, among other documents.

161.    These governing documents, including the Website's pop-up cookies window and Privacy Preferences window, contain enforceable promises that Respondent made to Claimant, including, but not limited to, the following:

    a.   The pop-up cookies window contained a link reading "Cookie settings[,]" indicating that instead of accepting all cookies, users could adjust their cookie settings by visiting the link;

    b.   Users of Respondent's Website can "choose not to allow certain types of cookies," as found in the Privacy Preferences window;

    c.   Users of Respondent's Website "cannot opt-out of [Respondent's] First Party Strictly Necessary Cookies[,]" and, by implication, the only Strictly Necessary Cookies placed by or used on the Website when users choose to opt-out of all other categories of cookies are first-party cookies from Respondent itself, as found in the Privacy Preferences window;

    d.   "Strictly Necessary Cookies" are those "necessary for the website to function and cannot be switched off in [Respondent's] systems…these cookies do not store any personally identifiable information[,]" as found in the Privacy Preferences window; and

    e.   "Targeting Cookies" are those "cookies [that] may be set through [Respondent's] site by [Respondent's] advertising partners. They may be used by those companies to build a profile of [users'] interests and show [users] relevant adverts on other sites. They do not store directly personal information[.]" Users can opt-out of, or otherwise decline or reject, these cookies by adjusting the toggle setting on the Targeting Cookies tab, as suggested by the form, appearance, and placement of the toggle setting in the Privacy Preferences window.

162.    Respondent breached these duties and violated these promises by causing such Targeting Cookies and software code to be stored on Claimant's devices and browsers that cause the transmission of private web activity and Private Communications, inclusive of users' personally identifiable information, to third parties and Respondent even though Respondent

represented that Claimant could decline, reject, or opt out of such cookies and the associated data sharing and use for targeted advertising and other purposes.

163.    Respondent further violated these provisions because Respondent did not honor users' requests to decline, reject, or opt-out of the selling and sharing of online data through the use of cookies and similar technologies, as described above, and because Respondent shared users' information with third parties even when users did not consent to such sharing.

164.    At all relevant times and in all relevant ways, Claimant performed his obligations under the contract(s) in question or was excused from performance of such obligations through the unknown and unforeseen conduct of others.

165.    As a direct and proximate result of Respondent's breach of contract, Claimant did not receive the full benefit of the bargain, and instead received services from Respondent that were less valuable than described in the contract. Claimant, therefore, was damaged in an amount at least equal to the difference in value between that which was promised and Respondent's partial, deficient, and/or defective performance.

166.    Respondent's breach caused Claimant the following damages:

    a.    Nominal damages;

    b.    The diminution in value of Claimant's personal information;

    c.    The loss of privacy due to Respondent making sensitive and confidential information that Claimant intended to remain private no longer private;

    d.    Respondent took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value; and

    e.    Claimant suffered an invasion of privacy. Claimant seeks compensatory damages for the invasion of his privacy.

167.    As a direct consequence of the breaches of contract and violations of promises described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, and any other just relief.

**TENTH CAUSE OF ACTION**

**Breach of Implied Covenant of Good Faith and Fair Dealing**

168.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

169.    Respondent's relationship with its users is governed by the Website's pop-up cookies window and Privacy Preferences window, among other documents.

170.    These governing documents, including the Website's pop-up cookies window and Privacy Preferences window, contain enforceable promises that Respondent made to Claimant and users, including, but not limited to, the following:

    a.  The pop-up cookies window contained a link reading "Cookie settings[,]" indicating that instead of accepting all cookies, users could adjust their cookie settings by visiting the link;

    b.  Users of Respondent's Website can "choose not to allow certain types of cookies," as found in the Privacy Preferences window;

    c.  Users of Respondent's Website "cannot opt-out of [Respondent's] First Party Strictly Necessary Cookies[,]" and, by implication, the only Strictly Necessary Cookies placed by or used on the Website when users choose to opt-out of all other categories of cookies are first-party cookies from Respondent itself, as found in the Privacy Preferences window;

    d.  "Strictly Necessary Cookies" are those "necessary for the website to function and cannot be switched off in [Respondent's] systems…these cookies do not store any personally identifiable information[,]" as found in the Privacy Preferences window; and

    e.  "Targeting Cookies" are those "cookies [that] may be set through [Respondent's] site by [Respondent's] advertising partners. They may be used by those companies to build a profile of [users'] interests and show [users] relevant adverts on other sites. They do not store directly personal information[.]" Users can opt-out of, or otherwise decline or reject, these cookies by adjusting the toggle setting

on the Targeting Cookies tab, as suggested by the form, appearance, and placement of the toggle setting in the Privacy Preferences window.

171.    Respondent breached these duties and violated these promises by causing such Targeting Cookies and software code to be stored on Claimant's devices and browsers that cause the transmission of Claimant's private web activity and Private Communications, inclusive of users' personally identifiable information, to third parties even though Respondent represented that Claimant could decline, reject, or opt out of such cookies and the associated data sharing and use, for targeted advertising and other purposes.

172.    California law recognizes the implied covenant of good faith and fair dealing in every contract.

173.    In dealing between Respondent and its users, Respondent is invested with discretionary power affecting the rights of its users.

174.    Respondent purports to respect and protect its users' privacy.

175.    Despite its contractual promises to allow consumers to decline, reject, or opt out of all categories of cookies, including Targeting Cookies, other than those first party cookies strictly necessary for the operation of the Website, Respondent took actions outside that contractual promise to deprive Claimant of the benefits of his contract with Respondent.

176.    Respondent's own tracking and its allowance of third parties to track and intercept internet communications was objectively unreasonable given its privacy promises.

177.    Respondent's unauthorized disclosure of users' personal information to Respondent was objectively unreasonable given Respondent's privacy promises.

178.    Respondent's conduct in tracking and causing third parties to intercept and track the internet communications of users who decline, rejected, or opted out of receiving such cookies evaded the spirit of the bargain made between Respondent and Claimant, since it caused Claimant to surrender more data to Respondent than otherwise bargained for.

179.    As a result of Respondent's misconduct and breach of its duty of good faith and fair dealing, Claimant suffered damages. Claimant did not receive the benefit of the bargain for

COMPLAINT AND DEMAND FOR ARBITRATION

which he contracted and for which he paid valuable consideration in the form of his personal information, which, as alleged above, has ascertainable value.

180.    As a direct consequence of the breach of the implied covenant of good faith and fair dealing described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, and any other just relief.

## ELEVENTH CAUSE OF ACTION

### Common Law Fraud, Deceit, and/or Misrepresentation

181.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

182.    Respondent has fraudulently and deceptively informed Claimant that he could "choose not to allow certain types of cookies" and, through the statements, form, and appearance of the Privacy Preferences window, further represented to Claimant that he had the apparent option to decline or reject all categories of cookies, including Targeting Cookies, other than first-party Strictly Necessary Cookies, among other representations. In fact, Respondent caused such Targeting Cookies and software code to be stored on consumers' devices—including Claimant's—even after users declined or rejected all such cookies. These cookies and software code caused the transmission of private web activity and Private Communications to third parties and Respondent when consumers visited and/or used the Website, even after consumers rejected or opted out of receiving such cookies.

183.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Respondent, not reasonably known to Claimant, and material at the time they were made. Respondent knew, or should have known, how the Website and cookies on the Website functioned, through testing the Website or otherwise, and knew, or should have known, that the Website placed such cookies on users' devices—including Claimant's—even after users rejected such cookies. Respondent's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Claimant as to whether to use the Website. In misleading Claimant and not so informing him, Respondent breached its duty to him. Respondent also gained financially from, and as a result of, its breach.

184.    Claimant relied to his detriment on Respondent's misrepresentations and fraudulent omissions.

185.    Claimant has suffered an injury-in-fact, including the loss of money and/or property, as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information, which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

186.    Respondent's actions caused damage to, and loss of, Claimant's property right to control the dissemination and use of his personal information and communications.

187.    Respondent's representation that consumers could decline, reject, or opt out of all categories of cookies, including Targeting Cookies, other than those first party cookies required for the operation of the Website, and thereby opt out of the sale of their personal information, was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the pop-up cookies window and Privacy Preferences window prior to using the Website. Had Respondent disclosed that it causes such cookies to be stored on consumers' devices, even when they choose to decline or reject all such cookies, Claimant would have noticed it and would not have used the Website.

188.    By and through such fraud, deceit, misrepresentations, and/or omissions, Respondent intended to induce Claimant, and other Website users, to alter their positions to their detriment. Specifically, Respondent fraudulently and deceptively induced Claimant to, without limitation, use the Website under the mistaken belief that Respondent would not collect data itself or share users' personal data with third parties through the cookies when consumers chose to decline or reject all categories of cookies, including Targeting Cookies, other than those first party cookies strictly necessary for the operation of the Website.

189.    Claimant justifiably and reasonably relied on Respondent's misrepresentations and omissions, and, accordingly, was damaged by Respondent.

190.    As a direct and proximate result of Respondent's misrepresentations and/or omissions, Claimant has suffered damages, as alleged above.

191.    Respondent's conduct, as described herein, was wilful and malicious and was designed to maximize Respondent's profits even though Respondent knew that it would cause loss and harm to Claimant and other Website users.

## TWELFTH CAUSE OF ACTION

### Negligent Misrepresentation

192.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

193.    Respondent represented to Claimant a fact that was not true, namely, that users could decline or reject all categories of cookies, including Targeting Cookies, other than those first-party cookies strictly necessary for the operation of the Website. In truth, Respondent caused such cookies and software code to be stored on consumers' devices and browsers, which caused the transmission of users' private web activity and Private Communications to third parties and Respondent, even after users declined or rejected such cookies.

194.    These representations were material at the time they were made. They concerned material facts that were essential to the decisions of Claimant and other Website users regarding whether and/or how to visit and use the Website.

195.    Respondent should have known its representations were false, and that it had no reasonable grounds for believing them to be true when it made them.

196.    Respondent intended that Claimant and users of the Website rely on Respondent's representations.

197.    By and through such negligent misrepresentations, Respondent intended to induce Claimant, and other Website users, to alter their positions to their detriment. Specifically, Respondent negligently induced Claimant, and its Website's users, to without limitation, browse the Website under the mistaken belief that Respondent would not collect data itself or cause the sharing with third parties of the personal data of Website users after they chose to decline or

reject all categories of cookies, including Targeting Cookies, other than those first-party cookies strictly necessary for the operation of the Website.

198.    Claimant reasonably relied on Respondent's representations.

199.    Claimant was harmed as set forth above.

200.    Claimant's reliance on Respondent's representations was a substantial factor in causing the harm.

### THIRTEENTH CAUSE OF ACTION

**Trespass to Chattels**

201.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

202.    At all times relevant, Claimant owned, leased, and/or controlled his devices.

203.    Respondent, intentionally and without consent or other legal justification, caused cookies to be stored on Claimant's browsers and devices, which enabled third parties and Respondent to track Claimant's activity on the Website and use the data collected for their own advantage, as described above.

204.    Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could decline or reject all categories of cookies, including Targeting Cookies, other than those first-party cookies strictly necessary for the operation of the Website. Respondent further failed to disclose that it causes unwanted third-party cookies and software code to be stored on consumers' devices and browsers, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent, even after consumers reject such cookies.

205.    Respondent's intentional and unjustified placing of cookies designed to track Claimant's internet activities and actual tracking of Claimant's activities interfered with Claimant's use of the following personal property owned by Claimant: (a) his computers and other electronic devices; and (b) his personally identifiable information.

206.    Respondent's trespass of Claimant's computing devices resulted in harm to Claimant and caused Claimant the following damages:

a.      Nominal damages for trespass;

b.      Reduction of storage, disk space, and performance of Claimant's computing devices; and

c.      Loss of value of Claimant's computing devices.

## FOURTEENTH CAUSE OF ACTION

### Unjust Enrichment

207.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

208.    Respondent created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

209.    Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could decline or reject all categories of cookies, including Targeting Cookies, other than those first-party cookies strictly necessary for the operation of the Website. Respondent further failed to disclose that it caused unwanted third-party cookies and software code to be stored on consumers' devices and browsers, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent, even after consumers decline or reject such cookies.

210.    Respondent received a measurable benefit at the expense of Claimant in the form of the additional data Claimant surrendered at Claimant's expense.

211.    Respondent appreciated, recognized, and chose to accept the monetary benefits that Claimant conferred onto Respondent to his detriment. These benefits were the expected result of Respondent acting in its pecuniary interest at the expense of Claimant.

212.    It would be unjust for Respondent to retain the value of Claimant's property and any profits earned thereon.

213.    There is no justification for Respondent's enrichment. It would be inequitable, unconscionable, and unjust for Respondent to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct. Claimant is entitled to restitution of the benefits Respondent unjustly retained and/or any amounts necessary to return Claimant to the position he occupied prior to having his Private Communications obtained by Respondent.

214.    Claimant pleads this claim separately, as well as in the alternative, to his other claims, as without such claims he would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

WHEREFORE, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

A.    An award of compensatory damages, including statutory damages where available, to Claimant against Respondent for all damages sustained as a result of Respondent's wrongdoing, including both pre- and post-judgment interest thereon;

B.    An order for full restitution;

C.    An order requiring Respondent to disgorge revenues and profits wrongfully obtained;

D.    An order temporarily and permanently enjoining Respondent from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

E.    For reasonable attorneys' fees and the costs of suit incurred; and

F.    For such further relief as may be just and proper.

Dated: July 18, 2024

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*

Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

# EXHIBIT B



## AMERICAN ARBITRATION ASSOCIATION

---

In the Matter of the Arbitration between

Case Number: 01-24-0006-5453

David Buehler
-vs-
Safelite Group, Inc.
(Collectively "Parties")

---

## RULING OF ARBITRATOR ON DISPOSITIVE MOTION OF NON-ARBITRABILITY

I, Carol Kingsley, THE UNDERSIGNED ARBITRATOR, having been designated by agreement of the above-named parties to serve as Arbitrator, and having been duly sworn, and having reviewed and considered the written documents submitted to me by the parties, both represented by counsel, do hereby Rule as follows:

**Background and Claims**

The Parties are in dispute whether an action by Claimant alleging a data breach while on Respondent's website ("Underlying Claim") must be brought in arbitration. Respondent asserts that the Parties are subject to an arbitration provision in its Terms of Service on its website. Claimant filed a dispositive motion asserting non-arbitrability.

Claimant asserts that he cannot be required to submit a dispute to arbitration where he did not agree to arbitration (citing *Granite Rock Co. v. Int'l Bd. of Teamsters*, 561 U. S. 287, 299 (2010) and *AT&T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649 (1986). Claimant describes Respondent's website agreement as a browsewrap agreement, that is, one that does not require the user to take any unambiguous action to agree to the website terms of use and that operates under the theory that the user accepts the terms of use simply by browsing the website. Claimant cites a strong history of court findings that such browsewrap provisions are unenforceable under California law. The courts have found that for a browsewrap agreement to be enforceable under California law, essentially, a written notice should be required to advise consumers that continued use of a website would constitute the consumer's agreement to be bound by the terms of use of the website. *Sellers v. JustAnswer LLC,* 73 Cal.App.5th 444 (2021); *Long v. Provide Commerce, Inc.* 245 Cal.App.4th 855 (2016); *Nguyen v. Barnes & Noble Inc.* 763 F.3d 1171 (9th Cir. 2014); and *Weeks v. Interactive Life Forms, LLC*, 100 Cal.App. 5th 1077 (2024).

Claimant states that the only agreement he had with Respondent concerns the use of cookies. Claimant provides evidence supporting his contention that the placement on Respondent's website of the Terms of Use does not satisfy the requirements of notice under California law. While Respondent refutes the limited nature of the Parties' agreement, it does not refute the browsewrap characterization of the website agreement nor factually distinguish this case in arbitration from those in the California case law cited by Claimant.

Claimant asserts that he never agreed to the Terms of Service or agreed to arbitration and brings this motion challenging arbitrability seeking injunctive relief, attorneys' fees, arbitration fees and costs, and interest.

The sole issue to be decided by this Arbitrator is the arbitrability issue and not the Underlying Claim. This Arbitrator finds that there is no arbitration agreement between the Parties.

**Ruling and Reasons**

Claimant is granted the claim of non-arbitrability. Claimant's arguments and supporting legal authority are persuasive. Moreover, Claimant signed a Declaration testifying that he was not aware of and did not consent to the Terms of Use nor any arbitration agreement with Respondent. Respondent provides no evidence that Claimant was aware of or consented to the Terms of Use nor any opposition to the case law setting forth applicable California law.

Accordingly, with no arbitration agreement between the Parties, this Arbitrator does not have jurisdiction to hear the Underlying Case, unless going forward the Parties were to agree to submit to arbitration.

Nothing in this ruling shall preclude the Parties from agreeing to arbitrate the Underlying Case if they should decide to do so.

**Summary of Ruling**

1. Finding for Claimant that this Arbitrator lacks jurisdiction.

2. Any claims for attorneys' fees and interest are not allowed.

This Ruling is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

May 21, 2025                    *Carol Kingsley*, Arbitrator